141 N.J. Super. 341 (1976)
358 A.2d 224
JUSTIN B. ROLFE AND JOAN S. ROLFE, PLAINTIFFS,
v.
THE BOROUGH OF EMERSON AND THE EMERSON BOARD OF ADJUSTMENT, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided April 27, 1976.
*344 Mr. Geoffrey Lebar for plaintiffs (Messrs. DeLorenzo and DeLorenzo, attorneys).
Mr. Joel Ellis for defendant Borough of Emerson.
Mr. Norman S. Costanza for defendant Emerson Board of Adjustment.
PRESSLER, J.C.C., Temporarily Assigned.
This is a land use planning case. Plaintiff Justin Rolfe, the proprietor of a school bus business, is presently, pursuant to contract with some 10 or 12 school districts in eastern Bergen County, providing the daily required transportation needs of the students of those communities. Since 1972, when he purchased a parcel of land in the Borough of Emerson, he has been unsuccessfully attempting to relocate the business in that municipality from its present inadequate site in the Borough of Dumont. He brought this action in lieu of prerogative writs seeking judicial relief from the repeated efforts of defendants Borough of Emerson and its board of adjustment to prevent him from making that use of his property. More specifically, plaintiff has challenged both the most recent refusal of the board of adjustment to recommend a use variance to the governing body and, on constitutional grounds, the most recent of a series of amendments to the borough's zoning ordinance prohibiting a school bus use of the premises in question. It is the conclusion of this court for the reasons herein stated that he is entitled to the relief he seeks.
*345 The variance issue was tried on the record made before the board of adjustment. The constitutional challenge to the ordinance was tried on the testimony of planning, traffic and real estate experts produced by both plaintiff and the borough. Cf. Odabash v. Dumont Mayor and Council, 65 N.J. 115, 121, n. 4 (1974).
The questions raised by the variance application are twofold. The first, essentially a question of law, is whether the use of property for a school bus garage facility serving a regional need is so inherently beneficial to the general welfare as to constitute a "special reason" within the intendment of N.J.S.A. 40:55-39(d), thus warranting the grant of a use variance, provided only that the "negative criteria" of the statute are met. The second, essentially a question of fact, is whether, if the use does not by its very nature rise to the status of "inherently beneficial," the general welfare would nevertheless be served by permitting it because it is a use peculiarly suited to the particular location for which the variance is sought.
The essential question raised by the constitutional challenge to the ordinance is whether a municipality, motivated by a desire to upgrade a specific area both economically and aesthetically, may rezone that area so as to render all or almost all of the existing uses therein nonconforming and to deprive the owner of the only vacant parcel in that area of a use undeniably compatible with the existing uses, particularly where there is substantial doubt as to the economic feasibility of utilizing that vacant parcel for any of the newly permitted uses and where those newly permitted uses are no less burdensome in terms of their potentially negative environmental impact than the now prohibited use.
Resolution of these issues requires some detailed delineation of the factual and procedural context in which they arise. As appears from the record made before the board of adjustment and from the court's physical inspection (undertaken at counsel's request) of the subject premises and their surroundings, the Borough of Emerson is one of the *346 municipalities of the so-called Northern Valley of Bergen County. Essentially a built-up suburban residential community consisting of single-family homes, it also has several areas devoted to a variety of commercial and light industrial uses. The town is bisected by Kinderkamack Road, a heavily travelled county thoroughfare, which is one of the major north-south traffic arteries in the eastern part of Bergen County. Immediately to its south lies the Borough of Oradell, not a dissimilar community. The premises in question are part of a triangle some six to seven acres in total area. The base of this triangle, some 330 feet in length, is formed by the Oradell-Emerson boundary line. Its easterly leg, some 1750 feet in length, is formed by a railroad right-of-way. Its westerly leg, some 1500 feet in length, is formed by Kinderkamack Road, which is its exclusive street access. The apex of the triangle lies at the intersection of Ackerman Avenue and Emerson Plaza West, the beginning of the central business district.
The uses in this triangle, all of which front on Kinderkamack Road, all of which have been there for some years, and most of which are on separate parcels of substantially less than an acre, are, from south to north, a Dairy Queen ice cream stand, a paper street which runs easterly to the railroad, an automobile transmission repair shop, a gas station, a Volkswagen body shop, a used Volkswagen dealership, a pizzeria, a small building housing a real estate and insurance office, a tavern, a small building housing a print shop and another real estate office, and an old single-family residence which has been converted into an art gallery. From the Volkswagen body shop north, these uses occupy the entire depth of the parcels on which they are located, i.e., from the Kinderkamack Road frontage to the railroad. The Dairy Queen, the transmission shop and the gas station, however, each occupy parcels fronting on Kinderkamack Road but only 125 feet in depth. Behind these three uses the land elevation drops sharply by some 20 feet. That interior hollow, lying between the front parcels and the railroad *347  vacant, swampy, overgrown and not visible from Kinderkamack Road  is plaintiff's property and the subject of this action. It is just under two acres in area and consists of two adjacent parcels separated only by the paper street.
To complete the description of the area immediately surrounding the subject premises, the uses on the west side of Kinderkamack Road opposite to the triangle in question consist, again from south to north, of a parcel of vacant land, a commercial kennel, a residence, a private nursing home, another residence, a dry cleaning establishment and a diner. Running from south to north, immediately east of the gully in which the subject premises and the railroad lie, are a corner of a private golf course, the borough's public works garage, a group of five small retail uses and a hotel. The germinal inspiration for Emerson's landuse policy of recent years in respect of the triangle, a policy which has resulted in this long-standing confrontation between plaintiff and the borough, is patently to be found in the development of the east side of Kinderkamack Road immediately to the south of the triangle and hence in the Borough of Oradell. There stand, side by side, on multi-acre, campus-type settings, two of the most attractive and high quality ratables in the county, the high rise regional headquarters of Xerox and Burns and Rowe.
The physical facts herein related have been relatively static since 1968, when the first relevant zoning ordinance amendment was adopted. Prior to that change the triangle, together with a 200-foot strip on the west side of Kinderkamack Road and the strip east of the railroad on which the five retail uses and the hotel are located, comprised one of the two "G" or general business zones of the municipality, in which were permitted a wide variety of commercial and warehousing uses, including public garages and depots. The 1968 amendment placed the triangle in a zone of its own as the borough's only "H" zone, in which was permitted the *348 single use of offices for the pursuit of the "recognized academic licensed professions."
Plaintiff acquired the subject premises in 1972, unaware of this apparently not widely advertised zoning change and relying on the former ordinance and the surrounding uses as indicating the permissibility of the school bus use. Learning of the 1968 zoning ordinance amendment after he had completed the purchase, he made his first variance application to the board of adjustment. His proposal at that time included the improvement of the paper street to provide access to Kinderkamack Road, indoor and outdoor facilities for the garaging, repairing and washing of some 20 to 30 buses (the washing equipment to recycle the water rather than disposing of it), a small facility to house an ancillary business of plaintiff's  the repair of apartment house coin-operated washing machines  and a public car wash. The application was rejected and the first stage of this litigation initiated, namely, a challenge to the rejection as well as to the 1968 ordinance amendment.
This court granted plaintiff the relief he sought, holding that the 1968 ordinance amendment was patently confiscatory, and this on the ineluctable conclusion that the potential use of plaintiff's nonvisible swampy hollow, located between the Dairy Queen and the railroad tracks, for an office building available only to a recognized academic licensed professional, was well beyond any realistic possibility.[1] It was the further holding of this court that plaintiff was entitled to the variance he sought for the school bus and washing machine repair use, but not for the public car wash, a plan which plaintiff is not now pursuing. Defendants appealed from the judgment in favor of plaintiff accordingly entered, but during the pendency of that appeal adopted a "comprehensive" zoning ordinance revision and *349 then moved the Appellate Division for a dismissal of the appeal on the ground of mootness. That court remanded to this court for determination of the effect of the new ordinance on the legal issues initially involved, and this court, in turn, remanded to the board of adjustment, first for supplementary record making, and then again to require the board, because of its failure in that regard, to make specific findings of fact and conclusions of law. During the pendency of the supplementary proceedings before the board of adjustment the borough again amended the zoning ordinance, this time for the sole purpose of redefining the permitted uses in the triangle.
The applicable zoning provisions as of the date of the conclusion of the board of adjustment proceedings, and as of the date of the trial hereof are essentially as follows: the triangle is now a self-contained "LBE" zone. There is one other such zone in the municipality, physically far removed from the triangle and not in issue in this action. The uses permitted in the triangle are now all uses permitted in the "LBW" zone and enumerated additional ones. The "LBW" permitted uses are limited to professional and governmental offices, medical and dental clinics, banks and other financial institutions, funeral homes, nursing homes, hospitals and schools. Clubs, lodges, fraternal organizations and "essential services," defined as services performed by public utilities or governmental agencies, are permitted by way of special exception. The additional uses permitted in the "LBE" zone are
2. Non-retail business and wholesale sales establishments which sell products or services to other businesses, industry or the trades and are not engaged in selling products or services to the general public except that building materials, food, vehicles, beer, soft drinks, solid, liquid or gaseous fuel distributors, trucking terminals, public or private garages, and bus terminals or storage yards shall not be considered permitted uses in this zone.
3. Only the following retail and service establishments: art galleries, retail clothing store, real estate offices, office equipment and supplies.

*350 4. Woodworking, furniture repair and upholstery, printing and publishing; electrical, plumbing and other building services.
Thus, of the ten uses presently in the triangle, all of which were conforming in 1968, seven have been rendered non-conforming.
The board of adjustment, considering the application in the context of the present ordinance, again rejected it. The undisputed proofs before it demonstrated that plaintiff now plans, by way of expansion of his business, to have a maximum of approximately 40 buses which will enable him to service some additional Northern Valley school districts. His present site will not permit of any expansion and is in fact now inadequate to accommodate the existing business in that there is no space for necessary indoor repair and washing facilities. Plaintiff made clear that bus cleanliness is essential to visibility and identification as a school bus, and is hence essential to safety. The new facility would also include in-ground fuel tanks and service vehicles. A small portion of the space would be devoted to plaintiff's ancillary service business, which is now a permitted use.
Critical to the application was plaintiff's testimony as to the bus schedules, namely, that they would leave the facility on a staggered basis between 6:15 and 7:00 A.M., returning after 9:00 A.M. On the homeward run, the buses would leave between 1:30 and 2:30 P.M., returning, again on a staggered basis, by 4:30 P.M. It is thus clear that they are not anticipated to be in transit in or around the Emerson facility during peak morning and afternoon rush hours. Except for an occasional transport for a sporting event, the buses will not be in use on weekends or evenings. Nor will they be in use at all during the summer months when school is in recess.
Plaintiff further testified that while he is compelled to leave his present site because of its inadequacy, finding an appropriate site is difficult. For reasons of economy the business must operate from a central Northern Valley location *351 while, at the same time, a prime expensive location is not economically feasible. Relatively low overhead is a necessary aspect of the business since bidding for school bus routes is, of course, competitive, and in any event increase in overhead would either reflect in the bids made and ultimately in taxpayers' cost or would place him in a noncompetitive position. The market price of the premises in question was, in fact, somewhat depressed. Aesthetic considerations were also relevant to plaintiff's choice of the site since, fully aware that a school bus facility is necessarily unsightly, he considered that the topography of the premises in question, which makes the whole operation nonvisible, made the property uniquely suitable, considering its general location. Finally, many of his buses at present run on Kinderkamack Road since that artery traverses many of the communities he is now servicing. Therefore, whether or not they are garaged off Kinderkamack Road, they will in any event necessarily be making use of it.
The testimony, in addition to plaintiff's, was that of his real estate expert, who also testified at trial, and whose opinion it was that the land, because of its location and topography, is commercially substandard, and while there may be a possibility of its utilization for a permitted use, that possibility is remote.
The board's resolution rejected the application essentially for these reasons: first, it concluded that the applicant had failed to prove that the land could not be used for a permitted use and hence that he showed no hardship; second, it found that the proposed use is "solely for profitable purposes and not for any public need or public good"; and finally, in general conclusionary terms, it noted that the relief if granted would "substantially impair the intent and purpose of the zone plan and zoning ordinance" and would be "detrimental to the health, safety and welfare of the citizens of the community and the community at large." These conclusions of the board defy the evidence presented to it, flout the common sense, logic and economic practicality of *352 the application before it, ignore the established patterns of the community, and finally, misconceive the controlling land use law of this jurisdiction.
At this point in the evolution of judicial construction of the planning law of this State it is virtually axiomatic to note that the grant of a use variance pursuant to N.J.S.A. 40:55-39(d) requires that the applicant shall have met both the affirmative and negative criteria prescribed by the statute. The affirmative criterion is statutorily expressed by the phrase "special reasons," and the negative criteria by the statutory mandate that the grant of the variance neither cause detriment to the public good nor substantially impair the zone plan and scheme of the community. It is also an expression of basic principle to note that the phrase "special reasons" takes its validating content from the statement of zoning desiderata set forth in N.J.S.A. 40:55-32, among which are promotion of the general welfare, conserving the value of property and encouraging the most appropriate use of land throughout the municipality. Uses which serve the general welfare are, moreover, generally one of two types: the "inherently beneficial" use, customarily of a public or quasi-public nature but not necessarily so, and the use which serves the public to some degree, but not inherently so. The effective distinction between them is that while a grant of a variance for either requires nonetheless that the negative criteria be met, the inherently beneficial use, by reason of the extent of its qualitative contribution to the general welfare, is, so to speak, its own raison d'etre, and no showing need be made of the particular suitability of the land for the use in question. A use not inherently beneficial, that is, one whose contribution to the general welfare is of lesser magnitude and of more ordinary currency, may nevertheless be raised to a sufficient level of general welfare promotion to sustain the required "special reasons" only on a showing of the peculiar fitness of the use to the particular location for which the variance *353 is sought. See generally, Kohl v. Fair Lawn Mayor and Council, 50 N.J. 268, 279 (1967).
It is this court's conclusion, based on the facts above recited, that plaintiff has so clearly borne his ultimate burden of proof of the particular suitability of the premises in question for the use sought that any contrary finding by the board of adjustment is arbitrary and unsustainable and that, as a further consequence, it is immaterial to this application whether the use is an inherently beneficial one, although for the reasons herein stated it is concluded that it is.
As to the land itself, it is, of course, still in a commercial zone. It should be further pointed out that even during the period of less restrictive zoning which preceded the first amendment in 1968, it was never developed despite the wide variety of then permitted business uses and despite the railroad's proximity  a further indication of its undesirability and unsuitability for customary commercial uses. Its elevational disparity vis-a'-vis the property fronting on Kinderkamack Road not only renders the land unattractive to any user dealing with the general public but also completely eliminates objection to the proposed use on aesthetic or nuisance grounds.
That use is, moreover, eminently compatible, both physically and functionally, with the surrounding commercial and governmental uses, most particularly the municipal public works garage to the rear of the property. The size is right. Its location in the hub of the serviced school bus routes and just off one of the main streets on which the buses run reduces overhead and thereby permits the providing of the service to the taxpayers' financial advantage. It is far removed from residential uses to which it might be a nuisance or a depreciating factor. This use is, moreover, likely to have a less adverse traffic impact on the heavily travelled county road here involved than would most of the permitted uses, in view of the fact that no traffic at all will be generated during two months out of every 12 and virtually *354 no traffic will be generated during the weekends of the remaining ten. Nor, because of their schedule, will the arrival and departure of the buses at the Emerson facility add appreciably to rush-hour traffic concentrations. Given the degree of development in the Northern Valley, it would be difficult to hypothetically posit a vacant available parcel more peculiarly suited to the use in question by reason of location, topography, size, cost, physical surroundings and traffic impact.
Nor does this court doubt, although the issue has not been heretofore passed on, that the use is one which is inherently beneficial and hence that the grant of a variance would not require the "peculiar suitability" showing. First, the state constitution itself specifically authorizes legislative provision for the transportation of school children at public expense. See N.J. Const. (1947) Art. VIII, § IV, par. 3. There can, moreover, be no real question that the transportation of school children in compliance with the mandates of N.J.S.A. 18A:39-1 et seq., adopted pursuant to the constitutional enabling provision, is a governmental function. It is clearly no less a governmental function if performed by a private contractor than by the school district itself. cf. Jackson v. Hankinson, 51 N.J. 230 (1968); McKnight v. Cassady, 113 N.J.L. 565 (E. & A. 1934). This is particularly so in view of the strict requirements imposed by the school bus legislation on both school boards and their contractors, and in further view of the stringent regulations promulgated by the Commissioner of Education which control and prescribe in detail every facet of a contracted school bus operation and its equipment to insure safety. See N.J.A.C. 6:21-1.1 et seq. Of particular relevance in these voluminous regulations are the dictates of N.J.A.C. 6:21-15.2, both as to the necessity of public bidding for school bus contracts and as to the obligation of school districts to encourage competition. And of direct impact here, especially as it relates to plaintiff's site selection, are the provisions of N.J.A.C. 6:21-7.3(c), requiring that
*355 Transportation routes should be arranged so that the buses will traverse the highways which serve the largest number of pupils within a reasonable time limit and at a minimum cost. Subject to exceptions * * * buses should not be required to leave the main route to pick up elementary pupils residing within 1 1/2 miles of the route and high school pupils residing within 2 miles of the route.
Despite the belief in some quarters that busing is a recent innovation devised exclusively for the purpose of achieving racial integration, the fact remains, as a matter of common knowledge and experience, that for decades the yellow school bus has been an integral part of the daily life of most of America's rural and suburban school children and that the furnishing of this transportation at public expense is an intrinsic part of the governmental obligation to provide a "thorough and efficient" education. Thus, in zoning terminology, a school bus facility is a use necessarily accessory to the school buildings themselves. As such, it is clearly "inherently beneficial" in the zoning sense.
That the school bus contractor makes a profit from supplying a statutorily-mandated governmental service does not detract from its status as a use which significantly advances the general welfare. It is true that many of the judicially recognized inherently beneficial uses are nonprofit, institutional, public or quasi-public uses. See, e.g., DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428 (1970) (nonprofit, governmentally-financed, low and moderate-income housing); Andrews v. Ocean Tp. Bd. of Adj., 30 N.J. 245 (1959), Black v. Montclair, 34 N.J. 105 (1961), and Roman Catholic Diocese of Newark v. Ho-Ho-Kus, 47 N.J. 211 (1966) (parochial schools); Roselle Pk. v. Union Tp., 113 N.J. Super. 87 (Law Div. 1970) (nonprofit, governmentally-financed, senior citizen housing); Bonsall v. Mendham Tp., 116 N.J. Super. 337 (App. Div. 1971) (seeing-eye dog facility). However profit-making uses, particularly those which, like the one here involved, serve regional needs and are of a utility or institutional type, have also been recognized as constituting adequate "special reasons." See, e.g., Yahnel v. Jamesburg Bd. of *356 Adj., 79 N.J. Super. 509 (App. Div. 1963), certif. denied 41 N.J. 116 (1963) (telephone equipment building); Wickatunk Village, Inc. v. Marlboro Tp., 118 N.J. Super. 445 (Ch. Div. 1972) (tertiary sewage treatment plant) Kunzler v. Hoffman, 48 N.J. 277 (1966) (private hospital for emotionally disturbed); Three L Corp. v. Newark Bd. of Adj., 118 N.J. Super. 453 (Law Div. 1972) (private day nursery); Burton v. Montclair, 40 N.J. 1 (1963) (private school); Brunetti v. Madison Tp. Mayor, Council, 130 N.J. Super. 164 (Law Div. 1974) (private middle-income, multiple-family housing).
The primary argument advanced by the borough at trial in resisting the conclusion that the school bus facility is indeed inherently beneficial is based on its claim that there was no showing by plaintiff that there is a need for such additional facilities in the county or region. The simple answer to this is that the complex of the aforecited statutes and regulations relating to school bus contracting makes clear the compelling governmental interest in promoting competition in the bidding for bus routes and hence that plaintiff's ability to operate more efficiently and to expand his operation so as to enable him to bid for additional routes subserves the public interest. At any rate, there does not appear to be a glut of school bus contractors operating either in the county or the region in question.
Finally, the question remains as to whether the so-called negative criteria have been met. Obviously, mere recitation of the statutory litany in the board's resolution does not support the conclusion that plaintiff failed in this burden. To the contrary, the evidence before the board compels the opposite conclusion. The facts herein recited with respect to the particular suitability of the site in question for the proposed use are equally persuasive with respect to the meeting of the negative criteria. Obviously this facility, which serves the region, must be located somewhere. Indeed, in the past plaintiff has serviced Emerson's school board and may do so again. From the point of view of environmental impact, *357 including traffic, and considering the nature of the surrounding uses and the established developmental pattern of the neighborhood, it is obvious that neither the public good nor the actual zone scheme of the community will be impaired by permitting this use. It should finally be noted that in all of the "inherently beneficial" variance cases above cited, the use was proposed for a residential area and resisted because of the feared effect of the intrusion of a different use on the character of the neighborhood and its property values. No such concerns are present or relevant to the commercially-zoned and used neighborhood here in question. Cf. Kremer v. Plainfield, 101 N.J. Super. 346 (Law Div. 1968). There is no reasonable basis at all on which the Board's denial can be justified.
The ordinance under attack, insofar as it affects plaintiff's land, is no more defensible in its intent to exclude plaintiff's proposed use than is the direct exclusionary action of the board of adjustment. Giving due consideration to the principle that the ordinance is entitled to a presumption of validity and that plaintiff bears the burden of proving the contrary, this court is nevertheless satisfied from the evidence before it that in respect of the subject premises the ordinance constitutes confiscatory inverse spot zoning.
The conclusion is inescapable that the zoning history of the triangle since the original 1968 amendment is an expression of Emerson's frustration, induced by Oradell's success and good fortune in having attracted the highly desirable Xerox and Burns and Rowe developments. The presence of those twin behemoths have infected Emerson with what its planning consultant has described as a bad case of "Oradellitis," a malady symptomized by an intense desire to see the small parcels comprising the triangle consolidated into single ownership, the structures thereon razed, and the Phoenix-like rising therefrom of a comparable attraction. The motive may be laudable. The ordinance-amendment technique, however, because it must fail as a matter of fact, must also fail as a matter of law.
*358 It was conceded by Emerson's experts that the ten uses now occupying the triangle, although mostly now zoned into nonconformance, are nevertheless stable, long-standing, going concerns which are likely to continue indefinitely. There being no realistic forseeable prospect that the effect of the zoning ordinance amendment will be a wholesale elimination of the present uses and the making available of the triangle for the high-quality attractive commercial development that Emerson would like to see there, it is evident that the only property in the triangle actually affected by the new use restrictions is the only remaining vacant parcel, i.e., plaintiff's hollow. The effect and intention of the amendment are to deprive this property of a use formerly permitted entirely compatible with the existing uses, and for which it is eminently suited.
While the 1968 amendment limiting the use to offices for "recognized academic licensed professionals" was patently confiscatory, the present amendment is hardly less so. The scope of the newly permitted uses is more illusory than real. The finding compelled by the testimony of the experts, and particularly the borough's experts, is that the land, by reason of its location and topography, is not really economically feasible for any of the permitted uses which require patronization by the general public, i.e., the office and limited retail uses, and that by reason of its size it is not really economically feasible for utilization for any of the remaining uses by a single user. More specifically, the borough's real estate expert believed that the parcel is too small to permit of any large-scale wholesale or warehousing or other of the permitted nonretail businesses but at the same time too large to be reasonably utilizable by a single small operation which would fall into the permitted use category. It was his opinion therefore that economic feasibility vis-a'-vis the actual use of the parcel would probably require multiple-use packaging by a developer rather than by an owner-occupant and would result in a group of various small separately owned and operated nonretail, nonmanufacturing, nonprocessing, *359 nonindustrial service-type businesses sharing the parcel, assuming, of course, that an adequate collection of such permitted users could be attracted to the site. It was his further optimistic opinion that he himself, a specializer in industrial and commercial development, might be able to put together such a package of users in nine months to a year of marketing. In view of the exclusive use of the surrounding properties by single-occupant commercial users, it is obviously unreasonable to place upon this property the onus of having to be developed as a mini-industrial park, even were that development to be reasonably practical.
Nor does the categorization by the ordinance amendment of what is a permitted use and what is not lend any rationality to the scheme contemplated for the zone by the amendment. The borough's sole attempted justification for the hodge-podge of permitted uses was purportedly traffic generation considerations. It is the borough's contention that because Kinderkamack Road is so heavily travelled, sound planning dictates that the nature of the new uses for which that street will provide sole access be such as will add as little as possible to its existing traffic burdens. Analysis of the permitted uses, however, fails to support the conclusion that traffic generation, either by nature or volume, provides an even arguable unifying concept of the categorization. For example, the only retail and service establishments permitted are art galleries, retail clothing stores, real estate offices and office equipment and supply business. The borough's planning expert was candid in his testimony that the real purpose of this category was to legitimatize, as still conforming, those of these uses which are presently in the triangle, since without this ad hoc provision all ten of them would have been rendered nonconforming. The clothing store was included, he believed, because at some point during the drafting of the ordinance there was indeed a proposal by an owner to introduce that use in the triangle. Patently, these uses are no different in terms of traffic impact than the whole panoply of other possible retail and *360 service uses. Nor does the grouping of "woodworking, furniture repair and upholstery, printing and publishing, electrical, plumbing and other building services" suggest uniquely minimal traffic uses. Finally, it is clear that the category of "nonretail business and wholesale sales establishments which sell products or services to other businesses, industry or the trades" implies a substantial traffic generation impact, wholesale uses involving customarily, as was testified, substantial warehousing and consequently heavy truck traffic. That obvious observation was countered by the opinion of the borough's experts that the property in question is really and hopefully too small to sustain a large enough operation in that category of permitted uses to result in that type of traffic.
From all of the foregoing it is quite clear that despite the patina of comprehensive zoning regulation suggested by the amendment, its primary motivation is its applicability to plaintiff's land and the avoidance, for no legally justifiable reason, of the legitimate use he hopes to make of it.
In this factual context it is evident that the ordinance amendment must fail. It is, of course, well settled that communities are afforded, by way of the exercise of the zoning power, broad latitude in attempting to achieve a reasonable, balanced and well-ordered scheme for land use development, and that that scheme cannot be permitted to be defeated simply because a property owner is deprived of the most profitable use of his land. But it is equally fundamental that the zoning power may not be exercised arbitrarily, unreasonably or capriciously. The test of reasonableness is whether or not the zone scheme is part of an integrated and comprehensive plan which, based on the character of the affected district and its peculiar suitability for particular use, promotes the zoning desiderata of N.J.S.A. 40:55-32 and hence offers a reasonable relationship between the public good and the use restriction. See, e.g., Scarborough Apartments, Inc. v. Englewood, 9 N.J. 182, 186 *361 (1952). And, as noted by the Court in Wilson v. Mountainside, 42 N.J. 426 (1964):
* * * [I]t is elementary that every district use classification is not saved simply because it is part of a comprehensive community plan. The plan to be a valid and effective influence in support of zoning regulations must not be a capricious one and its existence will generally not ipso facto insulate from scrutiny or invalidity the use classification of a substantial area which is established to be realistically unreasonable. [at 449]
Denying a small parcel of land the use natural to it in terms of the established surrounding uses and thereby substantially depreciating its value and use potential without at the same time justifying that deprivation on the basis of a reasonable relationship to the purposes legitimately attainable by zoning is by definition the capricious and arbitrary act of confiscatory inverse spot zoning. Odabash v. Dumont, Mayor and Council, 65 N.J. 115 (1974); Petlin Assoc. v. Dover Tp., 64 N.J. 327 (1974).
That is clearly the case here.
Plaintiff is entitled to the school bus use he seeks. He will, of course, have to comply with all of the municipality's site plan requirements, including the applicable state environmental protection codes incorporated by the zoning ordinance, and to that end no building permit shall issue until he has obtained planning board approval to the extent required by the ordinance.
NOTES
[1] This conclusion was, in effect, conceded to by the borough during the course of this trial, its planning consultant admitting that the 1968 amendment was actually intended as a building moratorium.