778 A.2d 482 (2001)
343 N.J. Super. 177
The MEDICAL CENTER AT PRINCETON and Princeton Medical Properties, Inc., Plaintiffs-Respondents,
v.
The TOWNSHIP OF PRINCETON ZONING BOARD OF ADJUSTMENT, municipal agency of the State of New Jersey, Defendant-Appellant, and
The Township of Princeton, municipal agency of the State of New Jersey, Defendant-Respondent, and
Jenny Crumiller, Jon Crumiller, Anita Garoniak, Marc Monseau, Susanna Monseau, Dennis Stark, Lisbeth Winarsky and Norman Winarsky, Defendants/Intervenors-Respondents.
The Medical Center at Princeton and Princeton Medical Properties, Inc., Plaintiffs-Respondents/Cross-Appellants,
v.
The Township of Princeton Zoning Board of Adjustment, municipal agency of the State of New Jersey, Defendant-Respondent, and
The Township of Princeton, municipal agency of the State of New Jersey, Defendant-Respondent/ Cross-Respondent, and
Jenny Crumiller, Jon Crumiller, Anita Garoniak, Marc Monseau, Susanna Monseau, Dennis Stark, Lisbeth Winarsky and Norman Winarsky, Defendants/Intervenors-Appellants.
Superior Court of New Jersey, Appellate Division.
Argued January 24, 2001.
Decided June 28, 2001.
*485 Robert P. Casey, Lawrenceville, argued the cause for appellant, in A-6885-98T5 and respondent, in A-6931-98T5, Township of Princeton Zoning Board of Adjustment, (Lenox, Socey, Wilgus, Formidoni & Casey, attorneys; Mr. Casey on the brief, in A-6885-98T5; in A-6931-98T5, attorneys rely on brief, filed in A-6885-98T5).
*486 Walter R. Bliss, Jr., Princeton Junction, argued the cause for appellants, in A-6931-98T5 and respondents, in A-6885-98T5, Jenny Crumiller, Jon Crumiller, Anita Garoniak, Marc Monseau, Susanna Monseau, Dennis Stark, Lisbeth Winarsky and Norman Winarsky, (Mr. Bliss and Virginia Kerr, attorneys; Ms. Kerr, on the briefs).
Edwin W. Schmierer, Princeton, argued the cause for respondent in A-6885-98T5 and respondent/cross-respondent, in A-6931-98T5 Township of Princeton, (Mason, Griffin & Pierson, attorneys; Mr. Schmierer, of counsel; Christopher H. DeGrezia and Georgia M. Fraser, on the briefs).
Christopher S. Tarr, Princeton, and Brian P. Sullivan, Chester, argued the cause for respondents, in A-6885-98T5 and Respondents/cross-appellants, in A-6931-98T5, Medical Center at Princeton and Princeton Medical Properties, (Smith, Stratton, Wise, Heher & Brennan, attorneys; Mr. Tarr and Mr. Sullivan, of counsel and on the briefs; Douglas S. Cohen, on the briefs).
Steven P. Goodell, Princeton, argued the cause, for amicus curiae Princeton Borough, in A-6885-98T5, (Herbert, Van Ness, Cayci & Goodell, attorneys; Mr. Goodell, of counsel and on the brief).
Before Judges WALLACE, Jr., CARCHMAN and LINTNER. *483
*484 The opinion of the court was delivered by CARCHMAN, J.A.D.
These consolidated appeals and the underlying litigation reflect the tension between a well-established hospital forced to expand and modify its services and facilities to meet the changing needs of a modern, yet increasingly competitive health-care provider to its constituent community, and a likewise well-established residential community that seeks to preserve the nature and integrity of its character and surroundings. The intent of both the Municipal Land Use Law (MLUL), N.J.S.A. 40:55D-1 to -136, and decisions interpreting this statute provide an appropriate methodology for harmonizing these worthy but sometimes conflicting interests.
The issue presented on this appeal is whether the "back-office" functions of an admittedly inherently beneficial use under the MLUL, N.J.S.A. 40:55D-70d, (section d), fall within the umbrella of the core use so as preclude the necessity of applying the enhanced burden of proof required for section d relief. Defendant Township of Princeton Zoning Board (the Board) denied the requested relief and, after appeal to the Law Division, Judge Feinberg, in a carefully reasoned and thorough opinion, answered the question in the positive.
We acknowledge that certain of the "back-office" functions of an admittedly inherently beneficial use may acquire the attributes of the primary or core-use. However, we conclude that the Board must apply a three-pronged test in determining the threshold question of whether certain uses which are not generally deemed inherently beneficial can be included within the scope of an inherently beneficial use. A zoning board must: (1) identify the proposed use and delineate its function; (2) establish how the proposed use is integrated into the core function of the inherently beneficial use; and (3) establish why the specific location of the proposed use is necessary to advance the purpose of inherently beneficial use. We deem this three-part test to be the threshold analysis prior to any Sica[1] analysis.
*487 In applying this test, we require that the Board deal with each proposed use and function as discrete and independent and make specific findings as to each proposed use rather than addressing the uses collectively.
We accordingly affirm the judgment of Judge Feinberg remanding this matter to the Board, and the Board shall reconsider the proposed application consistent with this opinion. We further affirm the judgment upholding the validity of Princeton Township Ordinance 95-26.

I.

A.
We briefly set forth the procedural posture of this appeal. Plaintiffs The Medical Center at Princeton and Princeton Medical Properties, Inc. (PMP)[2] (collectively "the Medical Center" or "hospital") filed an order to show cause and a complaint in lieu of prerogative writs seeking: (1) a declaration that the Board erred in determining that the use of five properties, located on Harris Road adjacent to the hospital, as offices was not an inherently beneficial use; (2) a declaration that the Board erred in denying the use variances; (3) a declaration that Princeton Township Ordinance 95-26 (the Ordinance) was arbitrary, capricious, and unreasonable; and (4) a stay of the enforcement of that Ordinance.
Responding to the order to show cause, Judge Feinberg imposed a stay that prohibited the Township from enforcing the Ordinance. The judge then granted leave to eight neighboring property owners, Jenny Crumiller, Jon Crumiller, Anita Garoniak, Marc Monseau, Susanna Monseau, Dennis Stark, Lisbeth Winarsky and Norman Winarsky (collectively "intervenors"), to intervene in opposition to the hospital's complaint. Thereafter, the judge issued a written decision remanding the variance case to the Board, but upholding the validity of the ordinance. The Board and intervenors filed notices of appeal, and the hospital filed a notice of cross-appeal. We subsequently issued an order permitting the Borough of Princeton to appear as amicus curiae.

B.
Because of the long history of discord between the hospital and its neighbors, we commence our analysis by presenting an extensive and extravagant exposition of the factual background of this dispute.
The hospital is an acute health care facility that has served the Princeton and surrounding communities for approximately eighty years. During that period, the hospital has expanded from a donated farm house to a regional facility attempting to keep pace with the changing face of the health care profession and demands to remain competitive by being "state of the art." The hospital occupies an area in the Township consisting of five acres bordered, in part, by twenty-four residential lots. This area, which includes properties located on Harris Road, is referred to as the "hospital block." The hospital began acquiring these properties in 1958, and now owns twenty-three of the twenty-four properties.
This appeal focuses on five properties that were originally used as single-family and duplex residences and are located on the west side of Harris Road between Franklin and Henry Avenues in the Township's R-8 residential zone. The properties *488 are located at street numbers 10, 12, 14, 16, 18, 30 and 36 Harris Road, also known as section 36.01, lots 10, 11, 32, 36, 37, and 39, and block 7101, lots 2, 3, 4, 5, 8, and 9 on the municipal tax map. The buildings erected on these lots total 9304 square feet. As the hospital's medical services expanded, it utilized these acquired properties for administrative purposes, with specific uses changing as the needs of the hospital changed. We summarize the present and proposed uses of these properties abutting the hospital as follows:

ADDRESS OWNER YEAR PROPOSED PRESENT USE
 ACQUIRED USE
10 Harris Rd. PMP 1990 public accounting
 relations
12-14 Harris Rd. PMP 1991/1994 accounting vacant
16-18 Harris Rd. PMP 1982 accounting accounting
30 Harris Rd. Med. Ctr. 1984 planning, planning
 fund-raising fund-raising,
 public
 relations
36 Harris Rd. Med. Ctr. 1976 purchasing purchasing

The nine thousand square feet encompassed by these administrative offices comprises in excess of one-third of the hospital's total space.
The following properties are also located on the west side of Harris Road:

ADDRESS OWNER YEAR LOCATION PRESENT USE
 ACQUIRED
2-4 Harris Rd. PMP 1990 Borough vacant
6 Harris Rd. PMP 1991/1994 Borough vacant
22 Harris Rd. Med. Ctr. 1982 Township vacant
26 Harris Rd. Mrs. N/A Township residence
 Carnevale
42 Harris Rd. Med. Ctr. 1965 Township short-term
 employee
 housing

In addition to these facilities, the hospital maintains other non-adjacent medical facilities in the community, including the Merwick Sub-Acute Rehabilitation Unit on Bayard Lane, the Princeton House on Herrontown Road, and an office complex with the Home Care Division on Bunn Drive.
The hospital's historical presence in the community has been the subject of extensive discussions by the Township, the Borough, and those agencies charged with enforcing the MLUL. An understanding of the relationship and evolution of the hospital's land uses and municipal land use planning is essential to understanding the present controversy.
Because of the geographic relationship and common interests of Princeton Township and the Borough, both municipalities joined in creating a regional planning board. See N.J.S.A. 40:55D-77. The Princeton Regional Planning Board (the Regional Board) is responsible for planning issues of both the Township and the Borough. The 1968 Princeton Community *489 Master Plan (the Master Plan) provided that the growth of hospital facilities would take place within the Borough for the most part, but it endorsed the expansion of the Medical Center's hospital uses to the full block bounded by Franklin Avenue, Witherspoon Street, Henry Avenue, and Harris Road.
The 1980 Master Plan states, in relevant part:
The Regional Planning Board endorses retention of the Medical Center at Princeton's hospital facilities within the Princeton community to ensure continued availability of its excellent health care services to the residents. With this endorsement, the Regional Planning Board recognizes that some changes and reasonable growth of existing facilities may be required in the future. All such changes, however, should be examined carefully to ensure that the surrounding established residential neighborhoods are not unduly affected by increasing traffic and parking problems and buildings of overwhelming height and scale.
The Board believes that the existing hospital site should be reserved for the hospital and hospital-related facilities only. Designation of a specific zone for that purpose would lend confidence both to the hospital's neighbors in the future integrity of their residential districts and to the Medical Center in the community's support for its continued service to Princeton and its environs. The Center's planning for future expansion should be guided by coherent and uniform bulk regulations, implicit in [the] the establishment of such a zone, rather than the present frustrating and cumbersome dual variance application approach to both Borough and Township agencies, which is dictated by the hospital's present setting in their residential districts. The Board therefore recommends the establishment of a hospital zone by Borough and Township ordinances for the block bounded by Witherspoon Street, Franklin Avenue, Harris Road and Henry Avenue.
The Board stresses, however, its determined intent to preserve the residential character of the neighborhood. It explicitly recommends that no exceptions to existing building height and front setback limitations should be allowed for the present and future lots fronting to a depth of 155 feet on the west side of Harris Road.
The Planning Board appreciates and commends the Medical Center's past efforts toward decentralization of its facilities. These have resulted in the transfer of certain uses from the existing buildings on Witherspoon Street to the Center's other properties, such as Princeton House, in the northern Township Service Zone, and Merwick. The Board urges the Medical Center, as future planning develops, to continue to explore the prospects for additional transfers, if feasible, in order to make way for necessary future expansion of the hospital-related facilities.
In 1982 the Township created the H-2 zoning district (hospital zone) at the corner of Witherspoon Street and Henry Avenue, which allowed for construction of the Medical Arts Building. The hospital zone includes only the hospital's main hospital building in the Borough and the Medical Arts Building in the Township.
The 1989 Master Plan provided that in 1988, the Medical Center was located on three sites in Princeton Borough and Township: (1) the Princeton Hospital site on Witherspoon Street; (2) the Merwick Unit, a rehabilitation and long-term care facility located on a nine-acre site on Bayard Lane; and (3) the Princeton House Unit, a mental health facility located on a *490 ten-acre site on Herrontown Road. The 1989 Master Plan states: "The Medical Center has been developing outpatient facilities in surrounding communities which it also serves. Expansion of certain hospital facilities, however, can be accommodated only at the central building in Princeton." In addition, that Plan states:
In accordance with the agreement that grew out of a recommendation made by the Regional Planning Board in the 1980 Master Plan, future expansions which must be made at the Medical Center itself, such as technical and intensive care facilities, will be contained within the existing hospital zone. Expansions that do not need to be at the Center will be located in decentralized clinics. Careful planning will be necessary to ameliorate adverse impacts upon adjacent neighborhoods.
Addressing the area of public health, the Plan also provides:
The Regional Planning Board continues to endorse retention of the hospital facilities of the Medical Center within the Princeton community to ensure continued availability of its excellent health care services to Princeton residents. With this endorsement, the Regional Planning Board recognizes that some changes and reasonable growth of existing facilities may be required in the future. All such changes, however, should be examined carefully to ensure that the surrounding established residential neighborhoods are not unduly affected by increasing traffic and parking problems and buildings of overwhelming height and scale.
Hospital facilities that must be located at the Medical Center, such as technical and intensive care facilities, should be located within the block bounded by Witherspoon Street, Franklin Avenue, Harris Road and Henry Avenue as recommended by the 1980 Master Plan. Otherwise, Medical Center facilities should be decentralized to the greatest extent possible. Strategies for mitigating adverse impacts upon surrounding neighborhoods should be incorporated into any future proposed expansion. One concern centers upon the issue of parking, often compounded by hospital visitors and staff members parking on adjacent residential streets rather than using the Medical Center parking garage. Office space leased by the Medical Center should include leased parking spaces in the garage for the lessee's employees.
Another concern centers on protection of the residential streets bordering the hospital (Franklin, Harris and Henry). The Planning Board, therefore, supports the Medical Center's past efforts towards decentralization of its facilities. These have resulted in the transfer of certain uses from the existing buildings on Witherspoon Street to Princeton House and Merwick, and the development of outpatient facilities in surrounding communities. As future planning develops, the Board urges the Medical Center to continue to explore the prospects for additional transfers where feasible in order to adequately provide for necessary future expansion of the facilities which can only be located in the central hospital.
In March 1994, while presenting an application for a floor-area-ratio variance related to the construction of an expansion to a parking garage, the hospital revealed that for a number of years it had used the properties located at numbers 10, 16-18, 22, 30, and 36 Harris Road for non-residential hospital functions in violation of the Township's hospital zoning ordinance. The Township zoning officer threatened prosecution, and the hospital responded *491 with an application to the Board for conditional-use approval to utilize these dwellings for administrative hospital functions.
On February 15, 1995, the Board granted a use variance for the hospital's construction of a parking garage expansion.
On October 16, 1995, the Princeton Township Committee enacted Ordinance 95-26, which provides:
1. The conditional use table set forth at Section 10B-320 of the "Code of the Township of Princeton, New Jersey, 1968" at subparagraph (h), is amended by deleting therefrom the reference to hospitals and shall read as follows:
(h) Nursing or convalescent homes.
2. This ordinance shall take effect upon its passage, publication and the filing of a copy with the Mercer County Planning Board, all of which as required by law.
On October 23, 1995, the Township zoning officer notified the hospital to cease any non-residential activity in all structures on the west side of Harris Road within thirty days. Ultimately, this dispute culminated in the filing of Municipal Court complaints and the imposition of fines for non-compliance.
The most recent Master Plan, adopted on December 12, 1996, as amended on May 15, 1997, marks a significant change in the continued use of residential properties by the hospital. The Plan provides:
For the first time in our history, Princeton is facing a shortage of vacant, easily developable land.... This document provides the opportunity to identify necessary community facilities and plan for them.
One of the major purposes of this Master Plan is to express community goals for the use of Princeton's land and facilities.... The Master Plan also seeks to preserve the existing character, mix, and densities of commercial, residential, and other land uses in Princeton.
....
The Land Use Element recognizes the fact that most of [the] land in Princeton has been developed and that there will be competing uses for the remaining lands. Specific recommendations include... preserving the character of established neighborhoods....
... Non-profit institutions should also be discouraged from purchasing private residences for non-residential use in adjacent residential neighborhoods to protect the small-scale character of those neighborhoods. The Board will be reluctant to grant any request for a change of use by nonprofit institutions in historic zones, in the downtown districts and in residential areas such as those along Harris Road.
....
As in the 1980 and 1989 Master Plans, the Regional Planning Board continues to endorse retention of the hospital facilities within the Princeton community. The facilities that must be located at the Medical Center, such as technical and intensive care facilities, should be located inside the Hospital Zone. Only residential use may be made of the hospital's properties on Harris Road.
The Township's 1995 Ordinance precluding the hospital's conditional use of the properties prompted the use variance issues which are the subject of this appeal.
At extensive public hearings, both the hospital and objectors presented considerable testimony regarding the hospital's proposed uses of the properties, the necessity of those uses to the hospital's operations, and the impact of such uses on the neighborhood. Dennis Doody, President of the Medical Center, described the present and proposed uses of the Harris Road *492 properties. He noted that 36 Harris Road was purchased by the Medical Center in 1970, that it presently houses the purchasing department consisting of seven employees, and that the hospital intends to keep the purchasing department there. He characterized the building as a buffer for the new parking garage located twenty feet behind it. The hospital's purchasing personnel manage the receipt and distribution of supplies for the main hospital building, and conduct daily meetings with vendors and hospital personnel regarding supplies, service contracts, equipment needs, and other purchases integral to the hospital's operations.
The hospital proposed placing its accounting department in 12/14 and 16/18 Harris Road. That department's activities also prompt daily contact with hospital personnel for payroll and personnel matters, including the signing of checks. In this regard, Doody also noted that managed-care questions and interactions with management regarding financial matters have greatly increased in the industry.
The hospital proposed moving its office for public relations, marketing, and planning, presently consisting of four employees and housed at 30 Harris Road, to 10 Harris Road. That department responds to patient-hotline calls, calls for physician referrals, and calls from the press. The Princeton Packet is across the street from the hospital on Witherspoon, and is involved with hospital personnel for various educational and health care events using hospital meeting rooms and facilities on a regular basis.
Doody also stated that the fund-raising or Foundation office has been at 30 Harris Road since 1984 and that plaintiffs proposed to keep it there. That office has daily interactions with hospital personnel and the public relations and marketing departments, and conducts fund-raising tours and visits to the hospital on a daily basis. The office also plans activities with the hospital auxiliary and the public relations office, and its employees meet daily with members of the medical staff and other hospital departments.
Doody noted that all of the above departments are vital and integral parts not only of this hospital's operations, but also of the operations of every hospital in the United States. Although not specific as to impact, Doody generally claimed that if these departments were moved off-site, the hospital would suffer a significant hardship both financially and organizationally. He opined that the best alternative locations for these departments were the Harris Road buildings because the houses are within easy walking distance of the hospital and the departments generate low levels of activity. The buildings also provide an excellent buffer from the very busy operations at the rear of the hospital.
Doody claimed that the hospital's use of the Harris Road buildings for offices has not been intrusive or detrimental to the neighborhood. Many neighbors did not know of the houses' uses until September 1993, when hearings were held concerning the new parking garage. The hospital's use of the buildings conforms with the thirty-year direction of the Master Plans and with other current uses on the block. Doody thus claimed that there was no negative impact on the community and that the hospital would enhance these buildings to a greater level than other residences in the surrounding community if the variances were granted. He also noted that there would be no additional traffic, no additional parking, and no building construction if the variances were granted. Ironically, Doody observed that Harris Road is not an ideal residential area because of its proximity to the busy hospital. Finally, he noted that although *493 the hospital has followed the Regional Board's direction to decentralize, virtually every hospital in the country has accounting and personnel departments within their hospital facilities.
Philip B. Caton, a professional planner and the hospital's expert, opined that the properties' uses fall under the umbrella of the hospital's inherently beneficial use. He premised his opinion upon both the certificate of need issued by the Commissioner of Health and the Board's earlier conclusion that the hospital's inherently beneficial use permitted expanding the parking garage in 1995. He observed that if the parking garage was a beneficial use, then the office uses would be as well.
Caton stated that the public interest at stake was the ability of the hospital to provide administrative support for its purchasing, accounting, fund-raising, and public relations operations. Addressing the detrimental effects that might ensue from a grant of the variances, Caton emphasized that there were no less than six different land use categories within one block of this area, and that the impact would be minimal due to the low number of employees, hours of operation, parking, visitors, and deliveries. To further reduce any detrimental effects, the hospital proposed landscaping and site-maintenance and repairs, and nine different suggestions to maintain the residential appearance of the properties and to continue operations only within certain hours.
In weighing the positive and negative criteria required by the MLUL to determine if the grant of the variances would cause a substantial detriment to the public good, Caton stressed the word "substantial." He concluded that the four-step Sica test was met, and that the Board should grant the variances. He also joined in Doody's observation that these houses were no longer desirable as residences, particularly because of the parking garage.
Caton conceded that the proposed variances for these properties are in direct contradiction to the 1996 Master Plan which discourages nonprofit institutions from purchasing private residences for nonresidential use in residential neighborhoods and states that the Board would be reluctant to grant any request for changes in use by nonprofit institutions in residential areas such as that along Harris Road.
The objectors presented expert testimony challenging the hospital's application. Tamara L. Lee, a professional planner, emphasized that the Master Plan could not be more specific in stating that only residential use could be made of the hospital's Harris Road properties. She noted that the trend of the Master Plans over thirty years was increasingly more restrictive with respect to the hospital's growth. That trend was also evidenced by the 1995 change in conditional-use zoning to eliminate the hospital conditional uses from residential zones.
Based upon that Ordinance and the Master Plans, Lee opined that the negative criteria of section d could not be satisfied through nonresidential uses on this part of Harris Road. She believed that the hospital was attempting to rezone the area through use variances. She noted that the hospital's certificate of need did not cover back-office operations, and that the hospital's 1995 application for the parking garage was for an inherently beneficial use because patients and staff would use the garage. There were no similar benefits inuring to the public for the back-office operations because those activities were subordinate to the core use of the hospital.
Lee relied upon Ordinance 10B-272.1(e)(4), which denominates management and medical staff offices as accessory *494 uses. Because the Master Plan identifies the core use of the hospital to be technical and intensive care facilities, the back-office functions could not be core uses. They were merely secondary to core use, not primary, and thus were not inherently beneficial to the public.
Lee rejected the hospital's argument that there were no detriments in the proposed use. The functional character of the houses was not addressed by the proposal, and the residential uses in the balance of the neighborhood would be jeopardized by conversion of one side of the street to non-residential uses. Most significantly, the variances would move the residential buffer and affect future applications for other lots. She disagreed with Caton that this was a mixed-use area, because the mixture of uses on Witherspoon Street did not affect Harris Road.
Lee stated that there were neither any conditions of approval that could avoid or prevent these detriments nor any positive aspects to the application. There was no inherently beneficial use and no special reason to support the proposal because it did not promote the public welfare or the purposes of the Ordinance or Master Plans. In sum, she opined that because these buildings are residences, they are not uniquely suited for office use. She also observed as evidence that a denial of the hospital's application would not create a hardship, and that several years ago, the hospital had been willing to tear the houses down for its parking garage.
Others spoke in favor of the hospital's application, including neighbors, physicians and employees. One witness, Ed Gwazda, the Executive Director of the Medical Center's Foundation, located at 30 Harris Road, again generally suggested that moving the Foundation would have a "chilling effect" on donations and would hamper his ability to meet with physicians, staff, patients, donors, and prospective donors. Those speaking in favor of the application were equaled by numerous witnesses who spoke against the variances, primarily out of fear that they would change the residential nature of the neighborhood.
After determining that the office use of the properties was not an inherently beneficial use, the Board discussed each property and denied each application.
In its resolution denying the applications, the Board set forth a summary of the testimony presented on six hearing dates, its findings, and its roll-call votes. The Board found:
[T]he proposed uses in the specific locations are not an integral part of the inherently beneficial Hospital use.... [T]he proposed uses were not particularly suited to the subject locations and could be located elsewhere to perform the same function.... [T]he unequivocal pronouncement in the current Master Plan against the proposed use provided clear direction which should be followed in the absence of compelling reasons to do otherwise. The Board was also concerned that the conversion of the subject residential structures would have a detrimental impact on the Township's inventory of affordable housing. The Board found no special reasons to support the grant of a use variance and no sufficient mitigating factors to lessen the negative impact of the intrusion of the proposed office uses into the residential neighborhood. The erosion of residential properties with commercial uses is contrary to the Zoning Plan and specifically contrary to the Master Plan.
Although the Board engaged in a specific discussion regarding each property, the resolution generally denied the variance application without reference to each proposed use. No mention was made of each use, nor was an analysis of the relationship *495 of the proposed uses to the core operating functions of the hospital performed.
On appeal to the Law Division, Judge Feinberg concluded that the hospital's administrative offices fell under the umbrella of the hospital's inherently-beneficial-use status. She remanded the case to the Board with instructions to perform the Sica analysis for consideration of a section d variance application for an inherently beneficial use without an enhanced quality of proof requirement as to negative criteria. She added that, on remand, the Board should consider whether the variances could be granted without substantial detriment to the public good and whether or not they would substantially impair the intent and purpose of the Master Plan and Ordinance.
Judge Feinberg also held that the Ordinance was adopted in accordance with statutory and municipal procedural requirements, and that the hospital had not overcome the inherent presumption of the Ordinance's validity. She found that the Ordinance advanced one of the fundamental purposes of zoning, that it was consistent with the land-use-plan element and housing-plan element of the Master Plan, and that it was constitutional.
The thrust of both the Board's and the intervenor's appeal is that the hospital's proposed uses of the properties for support offices do not qualify as inherently beneficial uses. The hospital challenges the finding of validity of the Ordinance.

II.

A.
We commence our analysis by reviewing general but inviolate principles necessary to a full consideration of the zoning issues involved. Variance questions are entrusted to the sound discretion of the municipal zoning board hearing the application. Kaufmann v. Planning Bd. of Warren, 110 N.J. 551, 558, 542 A.2d 457 (1988). The Legislature has recognized that local citizens familiar with a community's characteristics and interests are best equipped to assess the merits of variance applications. Ward v. Scott, 16 N.J. 16, 23, 105 A.2d 851 (1954); Hawrylo v. Bd. of Adjustment, Harding Township, 249 N.J.Super. 568, 578, 592 A.2d 1236 (App. Div.1991).
Accordingly, courts reviewing a municipal board's action on zoning and planning matters, such as variance applications, are limited to determining whether the board's decision was arbitrary, unreasonable, or capricious. Kramer v. Bd. of Adjustment of Sea Girt, 45 N.J. 268, 296, 212 A.2d 153 (1965); Med. Realty Assocs. v. Bd. of Adjustment of Summit, 228 N.J.Super. 226, 233, 549 A.2d 469 (App. Div.1988). A reviewing court must determine whether the board followed the statutory guidelines and properly exercised its discretion. Burbridge v. Governing Body of Mine Hill, 117 N.J. 376, 385, 568 A.2d 527 (1990).
Courts give greater deference to variance denials than to grants of variances, since variances tend to impair sound zoning. Cerdel Constr. Co. v. Township Comm. of East Hanover, 86 N.J. 303, 307, 430 A.2d 925 (1981); Mahler v. Bd. of Adjustment of Fair Lawn, 94 N.J.Super. 173, 186, 227 A.2d 511 (App.Div.1967), aff'd o.b., 55 N.J. 1, 258 A.2d 705 (1969). Reflecting the policy of the MLUL to favor comprehensive planning by ordinance rather than variances, use variances are appropriate only in "exceptional cases." Stop & Shop Supermarket Co. v. Bd. of Adjustment of Springfield, 315 N.J.Super. 427, 434, 718 A.2d 1218 (App.Div.1998), rev'd on other grounds, 162 N.J. 418, 744 A.2d 1169 (2000); Elco v. R.C. Maxwell *496 Co., 292 N.J.Super. 118, 126, 678 A.2d 323 (App.Div.1996).
In reversing and remanding the Board's denial of the hospital's proposed variances, Judge Feinberg determined that the Board erred in finding that the proposed uses of the Harris Road properties were not inherently beneficial. We now set forth the statutory scheme relating to inherently beneficial uses.
N.J.S.A. 40:55D-70 governs applications for "use" or "section d" variances. In its current form,[3] the provision authorizes the Board to:
d. In particular cases for special reasons, grant a variance to allow departure from regulations pursuant to article 8 of this act to permit: (1) a use or principal structure in a district restricted against such use or principal structure.... A variance under this subsection shall be granted only by affirmative vote of at least five members, in the case of a municipal board, or two-thirds of the full authorized membership, in the case of a regional board, pursuant to article 10 of this act.
If an application development [sic] requests one or more variances but not a variance for a purpose enumerated in subsection d. of this section, the decision on the requested variance or variances shall be rendered under subsection c. of this section.
No variance or other relief may be granted under the terms of this section, including a variance or other relief involving an inherently beneficial use, without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance.

[N.J.S.A. 40:55D-70d (footnote omitted).]
The provision requires an applicant to prove both positive and negative criteria to obtain a use variance. Smart SMR of New York, Inc. v. Borough of Fair Lawn Bd. of Adjustment, 152 N.J. 309, 323, 704 A.2d 1271 (1998). "In general, the positive criteria require that an applicant establish `special reasons' for granting the variance," and "[t]he negative criteria require proof that the variance "can be granted without substantial detriment to the public good" and that it "`will not substantially impair the intent and purpose of the zone plan and zoning ordinance.'" Ibid. (quoting Sica, supra, 127 N.J. at 156, 603 A.2d 30).
However, if the proposed use is inherently beneficial, the applicant's burden of proof is significantly lessened because "an inherently beneficial use presumptively satisfies the positive criteria." Id. at 323, 704 A.2d 1271 (citing Burbridge, supra, 117 N.J. at 394, 568 A.2d 527). The Sica Court explained that with an inherently beneficial use, satisfaction of the negative criteria does not depend upon an enhanced quality of proof, but rather upon balancing the positive and negative criteria. Sica, supra, 127 N.J. at 160-63, 603 A.2d 30. When striking the balance, boards must: (1) "identify the public interest at stake," recognizing that "[s]ome uses are more compelling than others"; (2) "identify the detrimental effect that will ensue from the grant of the variance"; (3) determine whether the detrimental effect can be mitigated by imposing reasonable conditions on the use; and (4) "then weigh *497 the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good." Id. at 165-66, 603 A.2d 30.
This procedure, while making it more difficult for a municipality to exclude inherently beneficial uses, permits exclusions when the negative impact of a use is significant. It also preserves the municipality's right to impose appropriate conditions upon those uses. Id. at 166, 603 A.2d 30.
Judge Feinberg concluded, and we agree, that hospitals are indisputably inherently beneficial uses. See Kunzler v. Hoffman, 48 N.J. 277, 286-87, 225 A.2d 321 (1966). The judge then focused on the remaining issue:
The more complex question, and one not specifically considered by the New Jersey courts, is whether each of the separate parts of an inherently beneficial usehere, the purchasing, finance, fund-raising, public relations, marketing and planning offices of the Medical Centerare to be considered part of that hospital's inherently beneficial use for land use purposes.
Judge Feinberg relied upon a series of cases by analogy. See Mega Care, Inc. v. Union Township, 15 N.J.Tax 566, 572 (1996) ("It is well established that hospital purposes include a variety of activities when undertaken to support the operation of a hospital."); Woodstown Borough v. Friends Home at Woodstown, 12 N.J.Tax 197, 203-04 (1992) (reviewing construction of the term "hospital purposes"); City of New Brunswick v. Rutgers Cmty. Health Plan, Inc., 7 N.J.Tax 491, 506 (1985) (noting within the context of a tax exemption application that "hospitals require laundry services, accounting services, parking facilities, and residential housing facilities for personnel" and that "[t]he facilities serving these purposes all exist for hospital purposes to the extent that they are an integral part of, and are reasonably necessary for the proper and efficient operation of the hospital facility"); Friedlander v. Zoning Hearing Bd. of Sayre Borough, 119 Pa.Cmwlth. 164, 546 A.2d 755, 757 (1988) (noting that a hospital's acquisition of property for office use was properly entitled to special use status as "`[h]ospital offices are just as much a hospital as patient rooms'"). While none of these cases address their specific issues within the context of inherently beneficial uses, they do advance the recognition that modern hospital operations involve more than simply patient beds or direct medical services. We agree with the Board that tax exemptions and zoning concepts are disparate concepts; however, the integration of functions in hospital settings is instructive on focusing on legitimate issues to be considered by land use agencies. The critical issue of whether an inherently beneficial use incorporates "back-office" functions can best be addressed not simply by viewing such functions in a vacuum but rather by understanding the role of the functions within the context of the entire operation of the underlying inherently beneficial use.
We recognize that the policy underlying a grant of tax exempt status to an ancillary function of a hospital serves a different purpose from a grant of favored treatment under zoning laws. While the grant of a tax exemption turns upon whether the ancillary function at issue generally serves the same desired public interests as the main institution, the grant of a zoning exemption turns upon whether the ancillary function must, by reason of need, be located in the same place as the main institution, which already enjoys inherently beneficial use status. We likewise acknowledge the intervenors' claim that a tax exemption does not entitle a use to be *498 considered, without more, inherently beneficial. Nevertheless, although we do not consider the analogous cases to be dispositive, we agree with Judge Feinberg that they provide assistance in understanding, conceptually, modern hospital practices and needs.

B.
In determining that the uses in question were not inherently beneficial within the umbrella of the hospital's beneficial use status, the Board generally considered the issue of location and proximity as relevant factors in performing its beneficial use analysis. It asserts that it did so because plaintiffs made those factors part of their application to support their position that the proposed uses were inherently beneficial.
Whether location and proximity may be considered in an application for relief as an inherently beneficial use is an evolving issue. In Kohl v. Mayor of Fair Lawn, 50 N.J. 268, 279, 234 A.2d 385 (1967), the Court suggested that location was not a relevant factor where the use was inherently beneficial. Interestingly, the Court did not exclude the issue as non-germane and it did not address the issue within the context of an ancillary use to an admittedly inherently beneficial use. See also Sica, supra, 127 N.J. at 160, 603 A.2d 30 (noting that where the use is inherently beneficial, the Court has never required that the site be particularly suitable or eligible for a permitted use).
Most recently, in Smart, supra, 152 N.J. at 331, 704 A.2d 1271, the Court applied location, among other factors, in considering whether a use qualified as inherently beneficial. In determining whether a mobile communications tower is an inherently beneficial use, the Court explained:
A mobile communications facility, which requires construction of a tower or monopole, is not suitable for every site. Although such facilities may promote the general welfare, towers and monopoles can pose special land use problems. A structure that exceeds permitted bulk requirements, particularly those pertaining to height, may be more appropriate in one zone than another or in one area of a zone than another. It is not that towers or monopoles universally are aesthetically displeasing. Nor is it that they necessarily impose an adverse effect on surrounding properties or a municipal land use plan. The point is that some sites are better suited than others for towers or monopoles. In sum, whether or not a radio transmission tower or monopole will substantially impair the character of a neighborhood will depend on the circumstances of each case.
Because of the preceding concerns, we believe the better judgment is not to declare communications facilities that require construction of towers or monopoles to be inherently beneficial uses. Although the issue is not before us, we might reach a different result with a facility that does not require a tower or monopole, such as one that simply involves appending antennas to an existing structure.

[Ibid.]
The Court then continued: "To resolve the present appeal, moreover, we need not declare such facilities to be inherently beneficial uses. A commercial use serves the general welfare and thereby satisfies the positive criteria if the use is particularly suited for the proposed site." Id. at 331-32, 704 A.2d 1271 (citing Medici v. BPR Co., 107 N.J. 1, 4, 526 A.2d 109 (1987); Kohl, supra, 50 N.J. at 279, 234 A.2d 385).
In analyzing the nature of the site within the framework of an inherently beneficial use, the Court has thus placed location *499 in the matrix for determining the threshold issue of whether a use is an inherently beneficial. We recognize, by way of distinction, that the proliferation of communications towers may present unique issues necessitating the incorporation of location into the analysis; however, location has also been considered in other more pedestrian circumstances.
In Rolfe v. Borough of Emerson, 141 N.J.Super. 341, 358 A.2d 224 (Law Div. 1976), plaintiffs sought to locate a school bus garage in the Borough of Emerson. They challenged both the refusal of a board of adjustment to recommend a use variance to the local governing body and ordinance amendments which prohibited school bus use on the premises. Id. at 344, 358 A.2d 224. Judge Pressler, then in the Law Division, found that a school bus facility was "necessarily accessory" to school buildings themselves because the transportation of students was an "intrinsic part" of the government's obligation to educate them. Id. at 355, 358 A.2d 224. The judge noted that the school bus garage was "eminently compatible, both physically and functionally, with the surrounding commercial and governmental uses, particularly the municipal public works garage to the rear of the property," and that it was "far removed from residential uses to which it might be a nuisance or a depreciating factor." Id. at 353, 358 A.2d 224. While here, there is significant testimony that the Harris Road location has an impact on the surrounding residential neighborhood, the significance of Rolfe is that location is a relevant factor to be considered in the beneficial use analysis. See also Scholastic Bus Co. v. Zoning Bd. of Fair Lawn, 326 N.J.Super. 49, 55, 740 A.2d 657 (App.Div.1999) (citing Rolfe and noting that a proposed site for an inherently beneficial school bus facility was "particularly suitable" for the proposed use).
Clearly, the consideration of location is "a two-edged sword." One edge suggests that an incursion into a neighborhood is detrimental and must be considered in the analysis, see Smart, supra, 152 N.J. at 333, 704 A.2d 1271; the other edge is that location is paramount in maintaining the ancillary use in close proximity to the underlying beneficial use, see Rolfe, supra, 141 N.J.Super. at 350-53, 356-57, 358 A.2d 224.
We recognize that Smart involved a use that was unique unto itself and independent of any other inherently beneficial use. That is not the case with Rolfe, where we analyzed the use within the context of another beneficial use, public schools. The latter circumstance apples with significant force here. In assessing the nature and relationship of the proposed use as inherently beneficial, the Board here, as that in Rolfe, was required to consider the uses as ancillary to an admittedly inherently beneficial use. That defining fact distinguishes Smart but implicates many of the considerations appearing in Rolfe. Location is a relevant factor because the application is premised on the proposed uses' proximity to the existing inherently beneficial use. To avoid a consideration of location not only distorts the facts but makes the analysis superficial. Critical to any proper analysis and consideration of the application is context, and context is measured by, among other factors, location.
We need not adopt a rule more expansive than that required by the facts here. We conclude that where a board is reviewing an application for a variance in conjunction with an existing inherently beneficial use, the board may consider the location of the proposed use in its analysis of whether the proposed use falls within the scope of the original use.

*500 C.

We expand our discussion to the issue of the function and integration. The Court in Smart gave further guidance for determining whether a use is inherently beneficial, as correctly identified by Judge Feinberg:
The Court in Smart SMR [, 152 N.J. at 329-31, 704 A.2d 1271,] outlined four criteria to be applied when evaluating whether or not a proposed use is inherently beneficial. These include: (1) whether the proposed facility will be used strictly for commercial purposes; (2) inherently beneficial uses are generally limited in number within a single municipality; (3) whether the use is exempt from regulation by state government[;] and (4) in the context of Smart the fact that the proposed communications facility included a 140-foot monopole.

[ (footnotes omitted).]
We expand consideration of the fourth factor beyond that of bulk requirements, a prime consideration in Smart, and suggest that in addition to location, the Board must consider the specific function of the proposed use and its relationship to the hospital in assessing the umbrella effect of the inherently beneficial use status of the hospital.
While the issue of integration of a non-inherently beneficial use has not been addressed directly, we have considered analogous circumstances when addressing ancillary or accessory uses. Cf. Shim v. Washington Township Planning Bd., 298 N.J.Super. 395, 403-07, 689 A.2d 804 (App. Div.1997) (noting that a child care center is "customarily incidental" to a church's principal use); Sugarman v. Township of Teaneck, 272 N.J.Super. 162, 172, 639 A.2d 402 (App.Div.), cert. denied, 137 N.J. 310, 645 A.2d 139 (1994) (rejecting the necessity of a separate variance for a nursery school operated within a religious facility); Kali Bari Temple v. Bd. of Adjustment of Readington, 271 N.J.Super. 241, 248, 638 A.2d 839 (App.Div.1994) (noting that a church and parish residence are an integral unit).
The Board argues that there is nothing inherently beneficial about these office uses to require their placement in a residential zone, noting that there are other zones in the Borough and Township available to accommodate these back-office needs. That is undoubtedly true; however, the proposed back-office uses cannot be assessed in a vacuumthey must be considered with due regard being given to the necessity of proximity to the hospital. The assessment also cannot be made broadly, but must be addressed specifically and considered on a use-by-use basis. We can easily surmise that a public relations use may not be as closely integrated into the day-to-day operation of a functioning full-service medical center, while accounting, procurement, or other administrative functions may well require more direct and immediate access which would be significantly compromised if the location of such functions was distant from the primary use.
We make no determination as to these issues, but will require on the remand that the Board consider the applications not collectively, but by individualized function. This also imposes a burden on the applicant to present the necessary proofs to specifically establish that a) the nature of the particular function, and b) how such function is integrated into the core function of the wholly beneficial use and c) why the location of each particular function is critical to fulfilling the mission and primary objective of the inherently beneficial use. We decline to address the intervenors' claim that the hospital has failed to meet its burden of proof. We *501 have now defined a rule which changes the nature of the proofs required and, on remand, the hospital will have the opportunity to meet that burden.
The primary question is whether a particular use must be adjacent to the hospital. This focused analysis was not incorporated in the Board's assessment of the application and the resolution fails to address the issues in this manner.
We recognize that determining whether a use is inherently beneficial is a fact-sensitive inquiry, even where the use involves health care or hospital facilities. See, e.g., Sica, supra, 127 N.J. at 159-60, 603 A.2d 30 (reviewing plaintiff's proofs in concluding that a head trauma rehabilitation center was inherently beneficial); Kunzler, supra, 48 N.J. at 281, 286-87, 225 A.2d 321 (decided without an inherently beneficial use analysis, but considering proofs of an urgent need for a specific type of private mental hospital); Jayber, Inc. v. Mun. Council of West Orange, 238 N.J.Super. 165, 174-75, 569 A.2d 304 (App.Div.), certif. denied, 122 N.J. 142, 584 A.2d 214 (1990) (finding that a senior citizen congregate-care facility was inherently beneficial); Urban Farms, Inc. v. Borough of Franklin Lakes, 179 N.J.Super. 203, 212, 431 A.2d 163 (App.Div.), certif. denied, 87 N.J. 428, 434 A.2d 1099 (1981) (holding that a nursing home with a certificate of need and one-third of its beds serving Medicaid patients was inherently beneficial).
We reject the Board's argument that permitting these functions would open the "floodgates" because under the banner of inherently beneficial use status for any function considered "auxiliary" or "accessory" to the hospital, plaintiffs would be empowered to lay claim to office space in residential neighborhoods throughout the town. In addition, the hospital is not the only inherently beneficial institution that may have a need for extra office space. The Borough agrees, stating that the ruling here, if allowed to stand, will impact greatly on its residential neighborhoods because other tax-exempt organizations with inherently beneficial uses would attempt to place their back-office operations in residential neighborhoods.
Certainly the hospital and even the Board's approach and consideration of this application without specific consideration of each function might well lead to that result. However, discrete findings consistent with the test we enumerate provides sufficient safeguards to protect against such concerns.
Intervenors maintain that alternative sites are available for functions and further claim, professional offices, including offices that directly deliver health care services, have never been deemed inherently beneficial. Intervenors explain that these offices are nine-to-five offices, with employees who are not involved in caring for patients. Nothing inheres in their day-to-day activities which intrinsically promotes the public welfare such as ministering to the sick, educating children, or providing vital housing opportunities. They claim that these offices' business functions are intrinsically less compelling than uses which have been determined not to be inherently beneficial, such as the dairy milk production in Kohl, supra, 50 N.J. at 279, 234 A.2d 385, or the farm produce stand that helped a farm survive in Demarest v. Mayor and Council of Hillsdale, 158 N.J.Super. 507, 509-11, 386 A.2d 875 (App.Div.), certif. denied, 78 N.J. 331, 395 A.2d 200 (1978). Intervenors rely upon Medical Realty Associates, supra, 228 N.J.Super. at 230, 549 A.2d 469, Mahler, supra, 94 N.J.Super. at 180-84, 227 A.2d 511, and Wajdengart v. Broadway-Thirty-Third Corp., 66 N.J.Super. 346, 352-53, 169 A.2d 178 (App.Div.1961), emphasizing *502 that even the private practice offices of professionals who provide health care to the public have never been deemed inherently beneficial. However, we note that in these latter cases, the issue of whether a use was inherently beneficial was not addressed.
We do not disagree in principle with the Board, Borough, or intervenors' arguments, but the view they express is too narrow. The proposed "back-office" uses here are neither singular in nature nor function. Moreover, the classic operation of a medical facility as a place to attend to the ill and infirm is not as simple as stating the proposition. The record alludes to circumstances which are well-known and recognized, that the delivery of medical care is in a state of change. See, e.g., Charles B. Gilbert, Health-Care Reform and the Nonprofit Hospital: Is Tax-Exempt Status Still Warranted?, 26 Urban Law. 143, 145-49 (Winter 1994) (generally discussing the changing nature of the delivery of health-care and the medical marketplace); Shelly A. Sackett, Conversion of Not-for-Profit Health Care Providers: A Proposal for Federal Guidelines on Mandated Charitable Foundations, 10 Stan. L. & Pol'y Rev. 247, 249-50 (Spring 1999) (discussing the revolution in health care and describing the evolution of hospitals in the community). These changes require a reassessment of how hospitals operate and how such operations may impact on ancillary issues such as the administration of our land-use laws. The impact may be minimal, but it is worthy of review even at the local level in considering applications which may appear to be as remote as a zoning application. We reach no conclusion that the proposed uses are or are not inherently beneficial; but each use must be addressed specifically, with findings as to each, consistent with the views we express here. Finally, these issues cannot be judged independently, but must be considered contextually with the existing independent use.
Our decision here requires the Board to reconsider whether each proposed use is inherently beneficial when considered with its relationship to the hospital, as well as whether the variances satisfy the negative criteria, see Smart, supra, 152 N.J. at 323, 704 A.2d 1271. "No variance or other relief may be granted under the terms of this section ... without a showing that such variance or other relief can be granted without substantial detriment to the public good and will not substantially impair the intent and the purpose of the zone plan and zoning ordinance." N.J.S.A. 40:55D-70d (emphasis added). It is an applicant's task to prove that the variance will satisfy the negative criteria. Leon N. Weiner & Assocs. v. Zoning Board of Adjustment of Glassboro, 144 N.J.Super. 509, 516, 366 A.2d 696 (App.Div.1976), certif. denied, 73 N.J. 55, 372 A.2d 320 (1977).
The 1996 Princeton Community Master Plan provides:
As in the 1980 and 1989 Master Plans, the Regional Planning Board continues to endorse retention of hospital facilities within the Princeton community. The facilities that must be located at the Medical Center, such as technical and intensive care facilities, should be located inside the Hospital zone. Only residential use may be made of the hospital's properties on Harris Road.
In its recommendation for institutional/educational uses, the land use element of the 1996 Master Plan provides:
Non-profit institutions should also be discouraged from purchasing private residences for non-residential use in adjacent residential neighborhoods to protect the small-scale character of those neighborhoods. The Board will be reluctant *503 to grant any request for a change of use by non-profit institutions in historic zones, in the downtown districts and in residential areas such as those along Harris Road.
We acknowledge that the Board concluded "that the unequivocal pronouncement in the current master plan against the proposed use provided clear direction which should be followed in the absence of compelling reasons to do otherwise." However, that finding was made as to the totality of the uses proposed rather than upon discrete analyses of each use as we have required here. Variances in some instances may be more compelling than in others and, as such, despite the Board's prior findings, some of the proposed uses may be more amenable to variance relief than others, even in the face of the language of the Master Plan and existing Ordinance.

D.
We now address the issue of the nature of proof required on this application. We restate some basic principles. Where the proposal is not an inherently beneficial use, the negative criteria are satisfied if the variance can be granted without substantial detriment to the public good and the applicant demonstrates through "an enhanced quality of proof ... that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici, supra, 107 N.J. at 21, 526 A.2d 109. However, where there is an inherently beneficial use, the applicant need not meet Medici's enhanced quality of proof. Smart, supra, 152 N.J. at 323-24, 704 A.2d 1271; Sica, supra, 127 N.J. at 160-62, 603 A.2d 30.
If it is not "inherently beneficial," the applicant must present what has been termed "an enhanced quality of proof" and there must be "clear and specific findings by the board of adjustment that the variance sought is not inconsistent with the intent and purpose of the master plan and zoning ordinance." Medici, supra, 107 N.J. at 21, 526 A.2d 109. That proof must "reconcile the proposed use variance with the zoning ordinance's omission of the use from those permitted in the zoning district." Ibid.
If the Board determines that a particular use is an inherently beneficial use, then we agree that Judge Feinberg set forth the proper standard to be applied in this case. She ordered: "[I]n considering the negative criteria, the Board shall not apply an enhanced quality of proof as that phrase has been described ... in Medici."
The "enhanced" standard of proof is not required, and instead the Board must employ a balancing test requiring that the Board: (1) identify the public interest at stake, recognizing that some uses are more compelling than others; (2) identify the detrimental effect that will ensue from the grant of the variance; (3) study whether the detrimental effect can be mitigated by imposing reasonable conditions on the use; and (4) weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good. Sica, supra, 127 N.J. at 164-66, 603 A.2d 30.
One additional issue must be addressed. The Smart Court explained that the recent amendment to section d of N.J.S.A. 40:55D-70 "substantially codifies the Sica balancing test." Smart, supra, 152 N.J. at 324, 704 A.2d 1271. Thus, even when a proposed use inherently benefits the general welfare, the applicant still must prove that the variance "`can be granted without substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning *504 ordinance.'" Ibid. (quoting N.J.S.A. 40:55D-70d). The 1997 amendment effectively serves as a reminder that even with inherently beneficial uses, applicants must satisfy the negative criteria. Ibid.
There is still disagreement about the standard of proof. In Funeral Home Management, Inc. v. Basralian, 319 N.J.Super. 200, 213 n. 3, 725 A.2d 64 (App. Div.1999), we commented that "[i]t would seem that the holding in Sica that the Medici enhanced proof requirement does not apply where the use is inherently beneficial has been abrogated by the Legislature. See L. 1997, c. 145, amending N.J.S.A. 40:55D-70(c) and (d)." That view has been adopted by commentators. Relying upon our footnote in Funeral Home Management, Cox has suggested that the intent of the amendment was to require boards and courts to apply Medici to inherently beneficial uses. Cox explains: "While this observation must be considered dicta it nevertheless appears to accurately reflect the legislative intent to treat all variances similarly with respect to the negative criteria." Cox, supra, § 8-2(c) at 206.
We view as dispositive the Court's holding in Smart that the amendment "substantially codifies the Sica balancing test." Smart, supra, 152 N.J. at 324, 704 A.2d 1271. We conclude that if the Board on remand determines that each or any of the proposed uses is inherently beneficial, the enhanced quality of proof does not apply to that specific use.

E.
The record satisfies us that within the constellation of its deliberative process, the Board touched on each of the prongs of the test we have enunciated. Various allusions to function, integration, or location appear throughout; however, our decision requires more than simply passing references to these issues. We now require specific findings as each of the issues we have identified on a proposed use-by-use basis.
The Board, on remand, must consider the nature of the function, its relation to the core-function of the inherently beneficial use, and the necessity of locating such function in close proximity to the inherently beneficial use.

III.
We now address the hospital's cross-appeal. In A-6931-98T5, the hospital contends that the Ordinance is invalid as applied to them. We disagree.
A zoning ordinance enjoys a presumption of validity, which may be overcome by a showing that the ordinance is clearly arbitrary, capricious, or unreasonable. Riggs v. Township of Long Beach, 109 N.J. 601, 610-11, 538 A.2d 808 (1988), See also F.M. Kirby v. Township Comm. of Bedminster, 341 N.J.Super. 276, 775 A.2d 209 (App.Div.2001). The party challenging the ordinance bears the burden to overcome this presumption. Riggs, supra, 109 N.J. at 611, 538 A.2d 808.
Generally, a zoning ordinance must satisfy certain objective criteria. First, the ordinance must advance one of the purposes of the Municipal Land Use Law as set forth in N.J.S.A. 40:55D-2. Second, the ordinance must be "substantially consistent with the land use plan element and the housing plan element of the master plan or designed to effectuate such plan elements," N.J.S.A. 40:55D-62, unless the requirements of that statute are otherwise satisfied. Third, the ordinance must comport with constitutional constraints on the zoning power, including those pertaining to due process, equal protection, and the prohibition against confiscation. *505 Fourth, the ordinance must be adopted in accordance with statutory and municipal procedural requirements.

[Id. at 611-12, 538 A.2d 808 (citations omitted).]
Additionally, there is a "judicial predisposition in favor of the validity of legislation," including local zoning ordinances, which makes courts ready to "impute a proper governmental purpose or interest as the object to be served by the enactment, and, if need be, infer an adequate factual basis to support" it. Bell v. Township of Stafford, 110 N.J. 384, 394, 541 A.2d 692 (1988).
Plaintiffs contend that the Township Committee's revocation of conditional use approval for hospital uses is arbitrary, capricious, and unreasonable.
A conditional use is "a use permitted in a particular zone, but only upon certain conditions." Cox, supra, § 17-1 at 377. N.J.S.A. 40:55D-3 provides:
"Conditional use" means a use permitted in a particular zoning district only upon a showing that such use in a specified location will comply with the conditions and standards for the location or operation of such use as contained in the zoning ordinance, and upon the issuance of an authorization therefor by the planning board.
Cox explains:
The treatment of conditional uses has been the subject of much deliberation in the courts, the reason simply being that a conditional use does not fit neatly into the prescribed rubric of either a permitted use or a prohibited use. Instead, a conditional use is a type of hybrid. The clearest indicator of a conditional use's dual nature is the fact that when a conditional use meets all of the conditions mandated in the ordinance, jurisdiction over such use lies solely with the planning board; however, unlike a permitted use, the planning board must grant approval to the proposed conditional use. On the other hand, when the proposed conditional use does not comply with all of the conditions, jurisdiction over such use lies solely with the zoning board of adjustment, which must determine whether or not to grant a variance pursuant to 40:55D-70(d)(3).

[Cox, supra, § 17-1 at 377.]
"The conditional use constitutes a legislative recognition that certain types of uses, while generally desirable, are not suitable for every location within the district, and that it is sometimes difficult to deal with the special problems inherent in such uses through the zoning ordinance." PRB Enters., Inc. v. South Brunswick Planning Bd., 105 N.J. 1, 8, 518 A.2d 1099 (1987).
Judge Feinberg correctly determined that the hospital did not overcome the Ordinance's inherent presumption of validity. The Ordinance advances one of the fundamental purposes of zoning, it is consistent with the land use plan element and housing plan element of the Master Plan, it is constitutional, and it was adopted in accordance with statutory and municipal procedural requirements.
The hospital first maintains that in 1996, the Township Committee amended its zoning ordinance so as to preclude hospital uses in all areas of the Township except the postage-stamp-sized H-2 hospital zone, which includes only one existing building in which only 20,000 square feet are devoted to hospital use.
The Township responds that the reason prompting the enactment of the ordinance deleting hospital uses as conditional uses in residential zones, and effectively preventing the hospital from using the Harris Road buildings for non-acute, back-office purposes, was to protect the welfare of the *506 community by safeguarding the character and integrity of its residential neighborhoods from the expansion of non-acute hospital functions into the surrounding neighborhood. The Township correctly asserts that this discernible reason, even if contested by the hospital, permitted the trial court to conclude that the hospital had failed to overcome the ordinance's presumption of validity on the grounds that the enactment was not reasonably related to the public health, safety, or welfare.
We reject the hospital's reliance on Lower Southampton Township Board of Supervisors v. Schurr, 72 Pa.Cmwlth. 322, 456 A.2d 702 (1983). The hospital contends that the Commonwealth Court ruled that where a prohibited use is unobjectionable and legitimate, the municipality bears the burden of proving that the ordinance's exclusion of such use is a valid protection of a police power interest. However, in Lower Southampton, the court actually stated:
[A] person who challenges the constitutionality of a zoning ordinance must overcome its presumed validity. It is now well settled that the presumption of validity is overcome by a showing that the ordinance totally excludes an otherwise legitimate use. In order for the presumption to be overcome, however, it must first be determined that the total prohibition is not prima facie valid due to the objectionable or illegitimate nature of the proposed use. If the use is found to be legitimate, the burden then shifts to the municipality to establish what police power interest is sought to be protected by the exclusion.

[Id. at 704 (citations omitted).]
Further, the court turned to the specific facts in the case and held that the Township failed to establish that its total ban of automobile salvage yards bore a substantial relationship to the public health, safety and general welfare. Id. at 705. Here, there is no total ban on hospital uses. The Ordinance and Master Plan provide for a hospital zone where hospital uses are permitted.
The hospital claims that the Ordinance fails to advance the MLUL's declared purpose of promoting the public health, safety, morals, and general welfare, the first criterion required in Riggs, supra, 109 N.J. at 611, 538 A.2d 808, and that it is contrary to all of the zoning purposes set forth by the Legislature. It explains that by foreclosing any opportunity for the Medical Center to expand beyond its current Township facilities, the zoning ordinance denies the Medical Center the right to fulfill its obligation to provide acute health care to the Princeton community. However, the Ordinance does not foreclose all opportunities, and variances are still permitted.
In addition, the hospital asserts that revocation of conditional use approval is unreasonable in its application to the Medical Center in light of its continuous growth and expansion on the hospital block. It claims that the Township Committee enacted this change despite the Medical Center's presence on the hospital block for almost a century and its continual purchase of properties in reliance on the Ordinance's conditional permission for hospital uses until 1996. However, reliance on conditional uses of property is not sufficient to overturn the Ordinance. A municipality may change its zoning ordinance during the pendency of a site plan application, even if the ordinance is amended in response to a particular application. Manalapan Realty, L.P. v. Township Comm. of Manalapan, 140 N.J. 366, 378-79, 658 A.2d 1230 (1995). The same reasoning applies to an application for a conditional use or a variance. "Because the enactment of, or amendment to, a zoning ordinance is a legislative act, the Township's *507 governing body is permitted to enact an amendment in response to objections to a proposed use of land as long as the amendment is consistent with the ... MLUL." Id. at 379, 658 A.2d 1230 (citing Hyland v. Mayor of Morris, 130 N.J.Super. 470, 479-80, 327 A.2d 675 (App.Div.), aff'd o.b., 66 N.J. 31, 327 A.2d 657 (1974)).
The 1995 amendment to the ordinance protects the character and integrity of the residential neighborhoods surrounding the hospital and thus protects the general welfare of the community as a whole. The Township correctly asserts that this is keeping with two purposes of the MLUL. First, the local body's action "promote[s] the establishment of appropriate population densities and concentrations that will contribute to the well-being of persons, neighborhoods, communities and regions and preservation of the environment." N.J.S.A. 40:55D-2e. Second, the Ordinance "encourage[s] municipal action to guide the appropriate use or development of all lands ... in a manner which will promote the public health, safety, morals, and general welfare." N.J.S.A. 40:55D-2a.
The record supports these claims. There is an overall scheme as set forth in the current Master Plan and earlier versions that shows significant concern for the residential neighborhood next to the hospital. The Township asserts that the hospital's argument about the impact on the public health, safety, or welfare fails because the uses in question are non-acute hospital functions that are permitted in the hospital zone or within other commercial zones in the Township. These functions proposed for the Harris Road buildings do not impact on the quality of care provided by the hospital. Thus, Judge Feinberg was correct in finding that the Ordinance advances one of the fundamental purposes of zoning.
The second criterion in Riggs is that the Ordinance must be "substantially consistent with the land use plan element and the housing plan element of the master plan or designed to effectuate such plan elements." Riggs, supra, 109 N.J. at 611, 538 A.2d 808. The Township accurately states that since 1980, the Master Plan has set forth an express policy goal to ensure the preservation of the Township's established residential neighborhoods. The Ordinance is in keeping with the express policy goals set forth in the Master Plan.
The third criterion is that the Ordinance must "comport with constitutional constraints on the zoning power, including those pertaining to due process." Ibid. The hospital asserts that the Ordinance prohibited it from use of the land for any purpose for which it was reasonably adapted. See Patrick J. Rohan, Zoning and Land Use Controls § 36.02[2] (1998) (stating that a property owner can successfully challenge a zoning limitation if the owner shows that "the restriction will preclude use of this land for any purpose to which it is reasonably adapted").
The Township relies upon Moroney v. Mayor and Council of Old Tappan, 268 N.J.Super. 458, 633 A.2d 1045 (App.Div. 1993), certif. denied, 136 N.J. 295, 642 A.2d 1004 (1994), and asserts that to succeed on such a claim, the hospital must show that the enactment destroyed all economic use of the properties. In Moroney, we stated that to show a taking by zoning ordinance, the landowner bears the burden to show that the regulations have destroyed all economically viable use of the property. Id. at 463, 633 A.2d 1045 (citing Klein v. New Jersey Dep't of Transp., 264 N.J.Super. 285, 294, 624 A.2d 618 (App.Div.), certif. denied, 134 N.J. 481, 634 A.2d 528 (1993)).
*508 The Township maintains that the hospital has not shown that the Ordinance destroyed all economically viable use of the properties, and that plaintiffs knew when they purchased the properties that the hospital knew when it purchased the properties that they were residential homes located in a residential zone. We agree. Simply stating the proposition answers the question. There are certainly economically viable uses for these properties, most notably as residences.
The fourth criterion requires that the Ordinance "be adopted in accordance with statutory and municipal procedural requirements." Riggs, supra, 109 N.J. at 612, 538 A.2d 808. The Township correctly contends that the hospital failed to allege or show that the Township's adoption of the Ordinance was contrary to any statutory or municipal standards. There was no claim that this criterion was not met.
We reject the hospital's attack on the Ordinance and affirm Judge Feinberg's determination in that regard.
The judgments of the Law Division, except as modified, are affirmed. The matter shall be remanded to the Zoning Board for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] Sica v. Bd. of Adjustment of Wall Tp., 127 N.J. 152, 603 A.2d 30 (1992).
[2] PMP is a not-for-profit corporation which exists because of bond covenants that encumber these Medical Center properties. Properties more recently purchased were placed under that not-for-profit real estate holding company totally controlled by the hospital, so that they would not be encumbered by the bonds.
[3] The underlined portion of this provision incorporates L. 1997, c. 145, § 1 effective June 30, 1997.