978 A.2d 325 (2006)
409 N.J. Super. 515
BOARD OF EDUCATION OF the CITY OF CLIFTON, Plaintiff,
v.
ZONING BOARD OF ADJUSTMENT OF the CITY OF CLIFTON, Defendant.
DOCKET NO. L-1674-06.
Superior Court of New Jersey, Law Division, Passaic County.
Decided November 9, 2006.
Approved for Publication September 2, 2009.
*329 Anthony D'Elia, for plaintiff (Chasan, Leyner & Lamparello, Secaucus, attorneys).
John D. Pogorelec, for defendant City of Clifton Zoning Board of Adjustment (Law Offices of John D. Pogorelec, L.L.C., attorneys).
Charles Rabolli, for intervenor Van Ness Family Trust (Carlet, Garrison, Klein & Zaretsky, L.L.P., attorneys).
Christine Cartwright Baker, for intervenor ProLogis 230 Brighton Road, L.L.C. (Drinker, Biddle & Reath, L.L.P., attorneys).
PASSERO, A.J.S.C.
Plaintiff Clifton Board of Education challenges a denial by Defendant Clifton Zoning Board of Adjustment of its use variance application to convert an industrial building into a school. The subject property is located in an industrial zone, where schools are not permitted.
This case requires an analysis of the traditional power of a municipal zoning board of adjustment in assessing negative criteria in connection with a proposed school. Specifically, the issue is whether that authority has been circumscribed by the New Jersey State Board of Education, acting pursuant to N.J.S.A. 18A:7G-1 to 48, and subsequent administrative code regulations promulgated thereunder. Also implicated in this case is the role of a municipal planning board in assessing the adequacy of a proposed school where a Master Plan has been enacted.
Here, the Clifton Board of Education, pursuant to passage of a local referendum, purchased a 69,695 square-foot building on a three-acre site in an industrial zone in the City of Clifton. The purchase was not subject to any contingencies even though a use variance would be required.
The School Board did not formally present its application to the Clifton Planning Board, pursuant N.J.S.A. 40:55D-31, but, rather, sent its site plans to the State Board of Education, which, by letter dated November 3, 2004, gave its initial approval for the placement of the school at the subject site.
Subsequently, the Zoning Board of Adjustment denied the School Board's application for a use variance after a bitterly contested hearing, encompassing seventeen separate hearing dates.[1] The Zoning Board denied the variance application on the grounds that, although the school is admittedly an inherently beneficial use, the School Board failed to satisfy the negative criteria required to obtain a use variance. The Zoning Board cited, among other reasons for denying the variance, safety concerns for the children walking to and from school, excessive truck traffic, conflict with the Master Plan, and lack of adequate parking.

*330 PROCEDURAL HISTORY

The Clifton Board of Education (hereinafter "School Board") is the owner of property located at 290 Brighton Road, Clifton, New Jersey, which is identified as Lot 8 in Block 48.04 on the Tax Map of the City of Clifton. The property is located within the M-2 General Industrial Zone, as defined in § 461-36 of the City of Clifton's zoning code. Schools are not permitted in M-2 zones. They are not allowed as of right in any zone but are permitted conditional uses in most zones. §§ 461.13.1(N), 461-27, 461-34 & 461-36. The entire opposite side of Brighton Road, the west side, is a residential zone as defined in Clifton's Zoning Code.
In December 2004, by way of a public referendum (with 68% of the vote), Clifton voters authorized the School Board to acquire the subject property. The referendum permitted the School Board to construct a 500-student ninth grade annex to mitigate overcrowding in Clifton High School. In May 2005, the School Board purchased the property at 290 Brighton Road from Mayer Textile Machine Corporation (hereinafter "Mayer"). Mayer owns and operates a business at 310 Brighton Road which is immediately north of the property. The subject property at 290 Brighton Road previously served as a warehouse and was vacant for approximately three years prior to the School Board's purchase.
On May 13, 2005, the School Board filed an application for a use variance with the Clifton Zoning Board. Two property owners in the vicinity of 290 Brighton Road opposed the application: (1) ProLogis 230 Brighton, LLC is the owner of property located directly south of the subject property, and (2) Van Ness Family Trust is the owner of property two lots north of the subject property. During the hearings, all sides put forth experts who testified as to the suitability and safety of the site for a school.
It is undisputed that (1) the present high school is overcrowded, (2) the three cafeterias are used to teach when not used for lunch time, (3) children are bused to a local Boys and Girls' Club for regular school programs, (4) teachers do not have homerooms, and (5) the school has eliminated such programs as woodshop, metal shop, and industrial arts due to spatial limitations. These findings are affirmed by the Clifton Master Plan, which states that from 1990 to 2000 the population of residents between the ages of 5 to 14 increased by 40.9%.
A 5-2 vote to deny the School Board's application was memorialized by the Zoning Board in its Resolution dated March 16, 2006 and adopted on April 19, 2006.

CLIFTON MASTER PLAN
In 2003, the Planning Board adopted an updated Master Plan which states that "The City of Clifton is the seventh largest city in New Jersey and is primarily developed as a residential community composed mostly of single-family detached and two-family dwellings. [It] is a fully developed community, with few remaining developable vacant lots. This established development pattern will revolve primarily around the community's response to redevelopment of existing sites, rehabilitation, and/or adaptive reuse of existing buildings and sites. The city's industrial base has declined over the past two decades, with several large, vacant or underutilized tracts offering the opportunity to pursue revitalization and redevelopment efforts."[2]
*331 The proposed site is located in the Allwood section of the City. Allwood "is primarily a single-family residential neighborhood. A significant portion of land in Allwood is devoted to non-residential uses, including industrial and commercial uses along the railroad line. In addition to [a] golf course, there are three public parks... here is one school property in the neighborhood."[3]
The updated Master Plan sets forth goals to direct the policies of the City. Some of the most pertinent goals for this case include:
Goal 6:
To encourage the re-use, rehabilitation or reconstruction of older non-residential areas and existing commercial and industrial structures which have been vacated for potential re-use as appropriate non-residential uses in order to maintain a balance of land-uses, existing jobs and to produce new jobs.
Policy Statement 6:
The City seeks to address the continuing loss of the manufacturing base by encouraging the adaptive reuse of older, obsolete industrial facilities. It is the policy of the City to promote the re-use of these facilities as non-residential uses.
Goal 9:
To provide adequate community facilities to serve Clifton's residents in terms of schools, parks and playgrounds, libraries, senior citizens centers, fire houses and other municipal buildings.
Goal 14:
To provide for a limited population growth during the time span of the Master Plan. The key factors which should be considered for the new development are ... open space and the availability of new public facilities, including public schools.
Goal 19:
To provide a variety of recreational uses for all segments of the City's population.

THE PROPOSED SITE
The subject property is located on Brighton Road which is an approximately sixty-foot-wide two-lane road with a 25 MPH speed limit. The street separates the neighborhood into two zones: the east side is an M-2 General Industrial Zone, and the west side is a residential zone. The property is located on the east side which is lined with industrial buildings set on large lots in a campus-like setting (including spacious frontages, trees and grass). The west side of Brighton Road is lined with Cape-Cod-style, single-family homes. Adjacent to the site, atop a grassy knoll, is a public park which contains a baseball field and basketball courts. A raised railroad track that runs parallel to Brighton Road is located approximately forty feet behind the structure, and a ten-foot-high barbed-wire fence separates the railroad track from the structure. The railroad tracks traverse the entire City of Clifton.
Presently, the main driveway for ingress and egress to the site is 92.58 feet wide and 313 feet deep. In addition, the site contains an approximately forty-by-seventy-foot easement, which is located in the back left portion of the property. The easement allows tractor-trailer trucks, making deliveries to Mayer, to enter onto the subject property while backing into Mayer's loading docks. Under the proposal, the school driveway will have a sliding gate to accommodate the easement, and, when trucks enter the school site, a faculty member will supervise the area.
*332 The School Board has also proposed certain changes to the site which can be seen on the site plan. The north side of the school will have approximately forty-two faculty parking spots, around which traffic will circulate. In front of the building, most of the greenage will be paved so that four buses can park. By a letter dated January 27, 2006, the New Jersey Department of Transportation approved a midblock crosswalk in front' of the site. In addition, as recommended by the City's engineer, the School Board will build a walkway across the street which will allow children to walk down the hill from the top of the park to Brighton Road.

I.
In viewing any case where a school is involved, we must commence our analysis by recognizing that there is a constitutional, statutory,[4] and Supreme Court[5] mandate to provide for the maintenance and support of a thorough and efficient system of free public schools, which includes ensuring that students are educated in physical facilities that are safe, healthy, and conducive to learning. N.J. Const. art. VIII, § 4, ¶ 1.
Obedient to the[se] directives, the lawmakers have legislated extensively in the field of both publicly and privately furnished education. A state board of education has been created and invested with broad supervisory power over all aspects of education. Likewise[,] school districts were established throughout the State (see, e.g., N.J.S.A. 18:5-1.1), and provision made for appointment or election of boards of education to control and regulate the manner and means of furnishing of education therein subject to the overall supervisory authority of the state board.

[Roman Catholic Diocese of Newark v. Ho-Ho-Kus Borough, 42 N.J. 556, 568, 202 A.2d 161 (1964)(Francis, J. dissenting).]
Also, where there are competing legislative enactments, courts must attempt to construe these provisions to give both full effect according to their plain language and the ascertained intent of the Legislature. Legislative intent and the meaning of a statute are derived from the nature of the subject matter, contextual setting, and relationship to statutes in pari materia. State v. Brown, 22 N.J. 405, 415, 126 A.2d 161 (1956).
In this case, we have several competing government entities and must reconcile their relationship to one another with regard to a use variance application for a school. Where a local Board of Adjustment is reviewing a use variance application for a school, the powers of the Zoning Board must be circumscribed in order to give full effect to the New Jersey Legislature's delegation of powers to the state and local school boards.
A "local board of education is an independent, autonomous corporate instrumentality of government within its territorial limits. As such, within its sphere of operation, it is not subject to the will or direction of the governing body of the municipality in which it functions, except to the extent that interdependence or connection has been imposed by the Legislature, either expressly or by inescapable *333 implication." Roman Catholic Diocese, supra, 42 N.J. at 558, 202 A.2d 161; See Gualano v. Bd. of School Estimate of Elizabeth School Dist., 39 N.J. 300, 303, 188 A.2d 569 (1963).
In Roman Catholic Diocese, the New Jersey Supreme Court held that "[o]rdinarily[,] there is no reason for a school board and the local governing body to quarrel about zoning matters. The school board as the State's agent to discharge the State's constitutional duty to provide for a system of free public schools ... is a distinct entity essentially independent of the local governing body." Roman Catholic Diocese, supra, 42 N.J. at 560-561, 202 A.2d 161. The Court continued stating, "the subject having been committed to a state agency, the municipal role was eliminated to avoid a division of responsibility. Thus[,] with respect to the sufficiency of the school plant itself the Legislature has both vested responsibility in a state agency and expressly barred the municipality. No such legislation exists as to zoning." Ibid.
Following this rationale, in Murnick v. Board of Education of the City of Asbury Park, 235 N.J.Super. 225, 227, 561 A.2d 1193 (App.Div.), certif. denied, 118 N.J. 201, 570 A.2d 963 (1989), the court held that:
a local school board is bound only by the use restrictions of the zoning ordinance of the municipality in which the proposed school is to be located. It is not subject to local land use provisions which regulate such matters as height, setbacks, parking and site plan approval. The State Board of Education has the statutory responsibility to approve plans for the construction of new schools.
The court continued by holding that "we read the applicable statutes to spell out a pattern of consistent, non-conflicting roles for all of the involved governmental entities the local planning board, the local school board, the State Department of Education and the State Board of Educationin the construction or improvement of public school facilities." Id. at 229, 561 A.2d 1193 (emphasis added). Thus, the Murnick court gave exclusive jurisdiction over site and bulk matters to the State Board of Education.
Subsequently, in 2000, the New Jersey Legislature adopted the Educational Facilities Construction and Financing Act (hereinafter "EFCFA") to "ensure that the Legislature's constitutional responsibility for adequate educational facilities is met" by establishing "an efficiency standard for educational facilities" because "[i]nadequacies in the quality, utility, and safety of educational facilities have arisen among local school districts of this State." N.J.S.A. 18A:7G-2 (emphasis added). The provisions of the EFCFA should be "construed liberally to effectuate the legislative intent and purposes of [the act] as complete and independent authority for the performance of each act and thing herein authorized and all powers herein granted shall be broadly interpreted to effectuate the intent and purposes and not as a limitation of powers." N.J.S.A. 18A:7G-29.
The New Jersey State Board of Education adopted a detailed set of regulations pursuant to the EFCFA "to consolidate, conform, and update other rules relating to educational facilities to ensure that the educational facilities in the State fulfill the Constitutional mandate. These rules are adopted in order to ensure that the educational facilities are safe, healthy and educationally adequate to support the delivery of the thorough and efficient education to which all students are entitled." N.J.A.C. 6A:26-1.1 (emphasis added).
This Court finds that, by the enactment of the EFCFA and subsequent administrative *334 codes, the Legislature invested the state with supremacy with respect to matters concerning the safety, health and adequacy of educational facilities. Specifically, the EFCFA expanded the State Board of Education's jurisdiction, previously outlined under Murnick, to include many off-site safety issues. The most pertinent statutory provision and regulations dealing specifically with safety and transportation include:
N.J.S.A. 18A:39-1.5 provides in pertinent part:
a. A school district that provides courtesy busing services shall adopt a policy regarding the transportation of students who must walk to and from school along hazardous routes. The policy shall include a list of hazardous routes in the district requiring the courtesy busing of students and the criteria used in designating the hazardous routes. In adopting its policy, the school district may consider, but shall not be limited to, the following criteria:
(2) Traffic volume;
...
(4) Existence or absence of sufficient sidewalk space;
(5) Roads and highways that are winding or have blind curves;
...
(9) Train tracks or trestles that must be crossed to reach the school; and
(10) Busy roads or highways that must be crossed to reach the school.
b. A school district shall work in conjunction with municipal officials in determining the criteria necessary for the designation of a hazardous route.
N.J.A.C. 6A:27-1.1 provides in pertinent part:
(b) District boards of education shall provide transportation pursuant to N.J.S.A. 18A:39-1 et seq. and shall adopt policies and procedures governing the transportation of students to and from school and school related activities.
N.J.A.C. 6A:27-11.4 provides in pertinent part:
District boards of education shall provide a safety education program to public school students, which includes pedestrian safety and rules for riding the school bus.
N.J.A.C. 6A:26-6.3 provides in pertinent part that the local school board shall be responsible for providing safe pick-up and drop-off areas for students and adults.
To ensure that local districts are complying with these regulations,' the County Superintendent of Schools is required to conduct a review of transportation operations. Furthermore, the Office of Student Transportation conducts quarterly reviews to examine the county superintendent's administration of student transportation. N.J.A.C. 6A:27-13.3.
Therefore, the EFCFA and the regulations enacted thereunder delegated to the State Board of Education the responsibility to ensure the safety of students with regard to on-site safety, off-site safety, and educational adequacy issues. Where the Legislature delegates responsibility in a particular area to a state agency, "[m]unicipal action with respect to purely local concerns cannot be permitted to nullify the effect of action taken by" the state agency. Scheff v. Tp. of Maple Shade, 149 N.J.Super. 448, 456, 374 A.2d 43 (App.Div. 1977), certif. denied, 75 N.J. 13, 379 A.2d 244 (1977). Here, since the Legislature gave the State Board of Education authority to make determinations regarding the safety and adequacy of educational facilities, the local zoning board must defer to *335 the State Board of Education's findings regarding these matters.
In Scheff, the Commissioner of Labor and Industry held that a proposed storage facility was safe. Id. at 448, 374 A.2d 43. The Appellate Division held that the zoning board was precluded from making a determination contrary to that of the Commissioner of Labor and Industry. The Court was clear that it had not reached the issue of preemption, but rather that the zoning board's decision was in direct conflict with the State's findings. Id. at 455, 374 A.2d 43.
In addition, several statutory rules of construction support a reading that the adoption of the EFCFA delegates such responsibilities to the State Board of Education. First, "[s]ince the Legislature is presumed to be fully conversant with its legislation, courts are to avoid constructions that make statutory provisions redundant or meaningless." State v. Wright, 107 N.J. 488, 502-503, 527 A.2d 379 (1987). To allow a local Zoning Board to hold additional hearings and make contrary findings to those previously made by the State Board of Education regarding matters of educational facilities and their safety would render the provisions of the EFCFA meaningless.
Secondly, specific provisions of a statute control more general provisions covering the same subject matter. New Jersey Transit Corp. v. Borough of Somerville, 139 N.J. 582, 661 A.2d 778 (1995)("It is a well established precept of statutory construction that when two statutes conflict, the more specific controls over the more general."). The EFCFA specifically addresses matters pertaining to the safety, health, and adequacy of educational facilities, whereas the powers granted to a local Zoning Board pursuant to the Municipal Land Use Law (hereinafter "MLUL") are general with respect to the regulation of educational facilities.
Furthermore, the act of circumscribing the powers of a municipal agency is not a novel concept. Under statutory law in New Jersey, the scope of municipal zoning boards has been circumscribed in analogous situations.
For instance, N.J.S.A. 40:55D-66.7a provides:
Any child care program approved by a local board of education and operated by the board or by an approved sponsor in a public school, before or after regular school hours, pursuant to N.J.S.A. 18A:20-34, shall be deemed a permitted use in all residential and nonresidential districts of a municipality and shall be exempt from local zoning restrictions.
Also, N.J.S.A. 40:55D-66.6 provides:
Child care centers for which, upon completion, a license is required from the Department of Human Services ... shall be a permitted use in all nonresidential districts of a municipality.
Thus, child care programs in schools approved by the State Board of Education and child care centers approved by the Department of Human Services are allowed as of right in any nonresidential zone of a municipality. In these instances, the Legislature gave exclusive jurisdiction over site plan and use matters to state agencies with expertise in the care and safety of children.
Therefore, when reading the extensive legislative scheme for education law in pari materia with the EFCFA, it is apparent that the Legislature intended to exclude certain issues from the jurisdiction of municipal zoning boards, including the safety of students, transportation, walking routes, and ingress and egress of a facility. The Legislature created a procedure in N.J.S.A. 40:55D-31 to allow a municipality, *336 through its planning board, to express its concerns about an educational facility. However, in making these recommendations non-binding, the Legislature expressed its intent to leave the ultimate decision of educational adequacy and safety within the jurisdiction of the State Board of Education. The "legislative scheme mandates against duplicate, time-consuming review of a proposed public school facility, with its potential for conflicting decisions, by the State Board of Education and the municipal board." Murnick, supra, 235 N.J.Super. at 231, 561 A.2d 1193; see generally, Kaveny v. Board of Comm'rs of Town of Montclair, 69 N.J.Super. 94, 99, 173 A.2d 536 (Law Div.1961), aff'd 71 N.J.Super. 244, 176 A.2d 802, certif. denied 36 N.J. 597, 178 A.2d 388.
It would create an insurmountable conflict if municipal zoning boards were allowed to deny a use variance application for a proposed school based largely on safety and transportation issues which were previously examined by the State Board of Education and where the State Board of Education previously approved the school facility. Such a holding would render the "educational adequacy" approval process meaningless. Thus, it is clear that a State Board of Education's findings pertaining to these matters trump contradictory findings by the Zoning Board. The Zoning Board's jurisdiction is limited to considerations of whether the use variance should be granted or denied premised on limited aspects of the negative criteria as they relate to the impact on the surrounding neighborhood and the negative impact on the zoning ordinance.
In light of this, we must determine whether the Clifton Zoning Board improperly considered school safety and transportation issues when reviewing the instant variance application. Pursuant to N.J.S.A. 40:55D-70(d) and relevant case law, a use variance may only be granted upon (1) an affirmative showing of "special reasons" (the "positive criteria"); and (2) a showing that the variance, if granted, will not result in a substantial detriment to the public good and will not substantially impair the intent and purpose of the zone plan and zoning ordinance (the "negative" criteria). Sica v. Bd. of Adjustment of Twp. of Wall, 127 N.J. 152, 156, 603 A.2d 30 (1992). It is the applicant's burden to show the "positive" and "negative" criteria in order for the Board to exercise its jurisdiction to grant relief under subsection d. See Cox on Land Use § 7-4.1 (Gann ed.2006).
An inherently beneficial use presumptively satisfies the positive criteria because inherently beneficial uses are assumed to serve the zoning purpose of promoting the general welfare. Burbridge v. Mine Hill Tp., 117 N.J. 376, 386, 568 A.2d 527 (1990). Also, with an "inherently beneficial" use, satisfaction of the negative criteria does not depend on an enhanced quality of proof. Instead, the grant of the variance depends on balancing the positive and negative criteria:
First, the Board should identify the public interest at stake. Some uses are more compelling than others.... Second, the Board should identify the detrimental effect that will ensue from the grant of the variance.... Third, in some situations, the local Board may reduce the detrimental effect by imposing reasonable conditions on the use. If so, the weight accorded the adverse effect should be reduced by the anticipated effect of those restrictions.... Fourth, the Board should then weigh the positive and negative criteria and determine whether, on balance, the grant of the variance would cause a substantial detriment to the public good.

*337 [Smart SMR v. Fair Lawn Bd. of Adjustment, 152 N.J. 309, 324 (1998)(quoting Sica, supra, 127 N.J. at 166, 603 A.2d 30)(emphasis added).]
In reviewing a municipal board's decision under the MLUL, the court's power is tightly circumscribed. "The court will not substitute its judgment for that of the board, and the board's action will be set aside only if the court finds a clear abuse of discretion." New York SMSA L.P. v. Bd. of Adj. of Tp. of Bernards, 324 N.J.Super. 149, 164, 734 A.2d 817 (App.Div.1999), certif. denied, 162 N.J. 488, 744 A.2d 1210 (1999). "[C]ourts reviewing a municipal board's action on zoning and planning matters ... are limited to determining whether the board's decision was arbitrary, unreasonable, or capricious." Medical Ctr. at Princeton v. Tp. of Princeton Zoning Bd., 343 N.J.Super. 177, 198, 778 A.2d 482 (App.Div.2001). In addition, greater deference should be given to a denial of a variance than to a grant. Id. at 199, 778 A.2d 482. However, matters of law are subject to a de novo standard of review by the Law Division. Wyzykowski v. Rizas, 132 N.J. 509, 626 A.2d 406 (1993).
The purview of a municipal body's jurisdiction is a matter of law. See generally, Murnick, supra, 235 N.J.Super. at 225, 561 A.2d 1193. If a denial of an application was based upon an improper consideration, the court should remand the matter to the board. See Exxon Co., U.S.A. v. Livingston Tp. in Essex Cty., 199 N.J.Super. 470, 489 A.2d 1218 (App.Div. 1985). In such a case, "the court would generally inform the board of the proper legal principles and the board would reconsider the application in light thereof." Cox § 33-3.1.
Here, it is not disputed that the proposed use is inherently beneficial, and, therefore the positive criteria are presumptively satisfied, In fact, schools are high on the spectrum of inherently beneficial uses. Nonetheless, the Board found in its Resolution "that the applicant did not sustain the burden of proof that the negative criteria was [sic] satisfied to support the grant of the application."
The "negative criteria" consists of a two-prong test: the applicant must establish that (1) the variance can be granted without substantial detriment to the public good and (2) the use would not substantially impair the intent and purpose of the zoning plan and zoning ordinance. N.J.S.A. 40:55D-70.
Here, the Zoning Board based its conclusion about the negative criteria on improper considerations. The Zoning Board made several findings that were within the sole jurisdiction of the State Board of Education. In both the Resolution and extensively throughout the hearings, the Zoning Board examined issues relating to not only the safety of the site, but many off-site safety issues. Specifically, numerous findings in the Resolution discuss the safety of children at the school site and en route to and from school. Such findings include:
e. ... that Brighton road is a heavily traveled truck route for the industrial uses; and based upon the testimony aforesaid, it is not safe for the students walking to and from school and being dropped off at the site; that a school in the middle of an industrial zone will create detriments to the industrial uses; that odor from diesel fuel is negative for the health and safety of the students; that areas on the walking route map are not safe for pedestrians; that noise generated by the trucks from the industrial uses is not conducive for educating students; that the location of the railroad tracks to the rear of the premises creates *338 additional hazards;, that the easement for the adjacent property is a hazard; that the conduct of a school at the site would be so limited that the students would be deprived of the education' and activities which they are entitled to.
...
1. That there are too many trucks to and from the adjacent site in question which create serious concerns for the safety of the students;
m. That there is parking on the sidewalks which presents a hazard to pedestrians;
n. That the walking route map is not safe; that Webro Road is not on the map; that the map did not show a 2½ mile radius; the map was not drawn to scale; that there is no traffic signal at Mt. Prospect Avenue and St. Andrew's Boulevard as previously testified; that the testimony concerning crosswalks on Market Street is inaccurate;
o. That the location of the easements [sic] on school property does not promote the health, safety, and welfare of the students at the site;
p. That the abutting property owner by way of easement has the right to drive tractor trailers onto the school property up to approximately 70 feet so that the abutting property owner may have access to its loading dock which creates a hazard for students attending the proposed school;
q. That the testimony concerning 24-hour-access to 290 Brighton Road by truck deliveries to 310 Brighton Road over the aforesaid easement is not feasible since there will have to be an attendant present to open and close the gates to allow trucks to enter and exit the proposed school property, which is detrimental to the health and safety of students and teachers at the site;
As cited above, statutory remedies are set forth which give the power to either the State or local school boards to address these issues. For instance, the Zoning Board believes that the walk route is unsafe because of a lack of sidewalks, truck traffic, and the presence of railroad tracks which make the walk longer. However, N.J.S.A. 18A:39-1.5, cited above, specifically lists all of these concerns as factors and allows the local school board to designate certain streets hazardous and provide busing if it sees fit.
Also, the Resolution states that the site is not safe for children to be dropped off and picked up. However, N.J.A.C. 6A:26-6.3 delegates the responsibility to approve the safety of pick-up and drop-off areas to the State Board of Education.
In addition, the Zoning Board found "[t]hat the location of the easements [sic] on school property does not promote the health, safety, and welfare of the students at the site." Again, this is a consideration for the planning board, the State Board of Education, and the Local School Board. N.J.S.A. 18A:7G-2 states that the Legislature is concerned about the safety of school facilities, therefore it created a state-wide standard which is under the control of the Department of Education.
The Zoning Board also stated that "the conduct of a school at the site would be so limited that the students would be deprived of the education and activities which they are entitled to." Here, the Zoning Board is taking it upon itself to define the parameters of art. VIII, § 4, ¶ 1 of the New Jersey Constitution. However, the Legislature specifically delegated that task to the Department of Education. Roman Catholic Diocese, supra, 42 N.J. at 568, 202 A.2d 161.
*339 Finally, even if the School Board were able to find another adequate property, subject to conditional use restrictions, on the opposite side of Brighton Road, the Zoning Board would have no authority to restrict the building of a school. Even though the same safety concerns would exist, that project would only be subject to approval of the State Board of Education.
It should be made clear that in no way does this holding attempt to abrogate the decision in Roman Catholic Diocese, supra. In that case, the Supreme Court held that "[n]o statute expressly exempts public schools from zoning[,] and no judicial decision has found the exemption. Indeed, we heretofore assumed that public schools are subject to zoning." Clearly, the Clifton School Board needs to apply for a use variance to utilize the subject property as a school.
However, in light of the above Legislative enactments, the jurisdiction of municipal zoning boards has been constrained. This Court is persuaded by the extensive framework of state education law that the New Jersey Legislature delegated the responsibility of educational adequacy, student safety, and student transportation issues to the State Board of Education. It would be contrary to the provisions of the EFCFA to allow a local Zoning Board to hold additional hearings and make contrary findings to those of the State Board of Education on these matters. The Zoning Board's consideration of student safety matters is at odds with the comprehensive legislative scheme that has been outlined above and acts "`as an obstacle to the accomplishment and execution of the full purposes and objectives' of the Legislature." Overlook Terr. Manag. Corp. v. Rent Control Bd. of W. New York, 71 N.J. 451, 462, 366 A.2d 321 (quoting Hines v. Davidowitz, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). In matters of educational facility adequacy, a Zoning Board must defer to the findings and conditions imposed by the State Board of Education, the agency delegated such responsibility.
Therefore, since a large portion of the Zoning Board's Resolution addresses issues outside of its jurisdiction, the entire Sica balancing test must be reexamined in light of these limitations. This Court orders that, on re-hearing, the Clifton Zoning Board of Adjustment must limit its negative criteria inquiry to (1) the impact on the public good, including the variance's effect on the surrounding properties (e.g., impact on property values, damage to the character of the neighborhood, traffic impact [excluding student safety issues]) and (2) whether the variance will substantially impair the intent and purpose of the zone plan and zoning ordinance.

II.
In addition to the above findings, the Zoning Board also memorialized several other improper findings in the Resolution.

A.
The expert testimony given by Dr. Bonagura was a net opinion. N.J.R.E. 702 permits a qualified expert witness to testify in the form of an opinion or otherwise, and N.J.R.E. 703 addresses the bases of opinion testimony by experts. The corollary of that rule is the net opinion rule, which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other data. Simply put, the net opinion rule requires an expert to give the why and wherefore of his/her opinion, rather than a mere conclusion.
Thus, an expert's bare conclusions, unsupported by factual evidence or other data, are inadmissible as a mere "net opinion." Matter of Yaccarino, 117 N.J. *340 175, 196, 564 A.2d 1184 (1989); Buckelew v. Grossbard, 87 N.J. 512, 524, 435 A.2d 1150 (1981). For example, in New Brunswick Cellular v. Board of Adjustment, 160 N.J. 1, 16, 733 A.2d 442 (1999), the expert opinion that the presenee of a communications monopole would "derail" development, unsupported by any studies or data, was tantamount to a net opinion. 160 N.J. 1, 16, 733 A.2d 442 (1999).
On November 5, 2005, Dr. Vincent Bonagura, an environmental expert, testified on behalf of intervenor Van Ness. This was the only evidence offered as to the negative effects of tractor trailer fumes on the health of children. He testified that, "children, who have asthma, who are prone to asthma and allergic disease" are at "risk for worsening of their asthma ... when exposed to levels of particles emitted from the diesel trucks."
However, he continues, this risk depends on "the distance from the traffic, the volume of traffic, and ... the genetics of the children." Also, while the level of exposure to fumes depends on the "logisitics of the filtering system," Dr. Bonagura admits he has "nil" experience with ventilation systems.
According to Dr. Bonagura, his opinion was based on (1) conversations with Mr. Van Ness about the truck traffic at his facility, (2) Mr. Van Ness's estimates of truck traffic at ProLogis, (3) pictures of the existing site, and (4) testimony from that morning. However, Dr. Bonagura never examined the proposed plans. Specifically, he had no knowledge of the school's ventilation and window system. Also, he admitted that he was not aware that the students could not leave the school during the day.
This Court finds no reliable facts, data, or studies set forth in the record upon which the opinion of Dr. Bonagura could be supported. Dr. Bonagura states that the detriments of fumes from trucks depend on several factors listed above. However, Dr. Bonagura clearly has no knowledge as to the presence of these factors in this application. He knows nothing about the distances from the site to the industrial parks, nothing about the proposed plan, nothing about the ventilation system, nothing about the volume of truck traffic, and nothing about the neighborhood. Dr. Bonagura's testimony amounts to bare conclusions, unsupported by factual evidence, based only on estimations and guessing.
Therefore, his testimony is a "net opinion" and could not be properly relied upon by the Zoning Board, which stated in its Resolution, "[t]hat the odor of diesel fuel is noxious, truck traffic is heavy and will be detrimental to the safety of the neighborhood." All testimony from Dr. Bonagura regarding the effects of noxious fumes on students will be excluded based on two grounds: (1) it deals with the safety and health of children, and (2) it was a net opinion.

B.
The Zoning Board found that "the proposed school in an industrial zone will not be in accord with the intent and purpose of the master plan." A Zoning Board should not grant a use variance unless the proposed use is consistent with the Master Plan and zoning ordinance. Medici v. BPR Co., 107 N.J. 1, 526 A.2d 109 (1987). With the passage of the MLUL, the land use element of the Master Plan is required to be the basis for any zoning ordinance. See Cox, supra, § 40-2.
At no time did the Defendant or any of the experts point to a specific provision in the Master Plan for which the proposed Annex would be inconsistent. Defendants rely solely on the fact that the *341 zoning ordinance does not allow schools in an industrial zone. However, no evidence suggests that the Master Plan will be impaired by the existence of the proposed school at the site in question. After a review of the testimony and the Master Plan, this Court finds that the proposed school would be consistent with the intent and purpose of the Clifton Master Plan. Specifically, the provisions of the Master Plan, quoted above (i.e. Policy Statement 6 and Goals 6, 9, 14, and 19) and the stated increase in the school age population lend support to this finding.

C.
The Zoning Board found that "[t]hat the applicant has created its own hardship by purchasing the property without obtaining a use variance." During the vote on March 16, 2006, Acting Vice Chairman Farinella stated, "in my opinion, the Applicant has not proven a hardship because there is no hardship." Prior to the 1948 Amendments to MLUL, the grant of a use variance always required a finding of undue hardship. Medici, supra, 107 N.J. at 9, 526 A.2d 109. However, when the Amendments introduced the "special reasons" standard, undue hardship ceased to be a prerequisite for grant of a use variance.
Here, the proposed use is an inherently beneficial use. Therefore, the special reasons standard has been satisfied, and there is no need for the Zoning Board to consider hardship in this application.

D.
The Zoning Board held "[t]hat the location of the school in the middle of the industrial zone would amount to spot zoning." Spot zoning is the "re-zoning of a lot or parcel of land to benefit an owner for a use incompatible with surrounding uses and not for the purpose or effect of furthering the comprehensive zoning plan." Cox, supra, § 34-8.2. Otherwise expressed, it is the use of zoning power to benefit particular private interests rather than the collective interests of the community. Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6, 18, 364 A.2d 1016 (1976), cert. denied, 430 U.S. 977, 97 S.Ct. 1672, 52 L.Ed.2d 373 (1977). Here, there are no private interests being benefited. The presence of a new school, especially in an over-crowded district, is for the benefit of the entire community and, therefore, does not amount to spot zoning.

E.
Finally, throughout the entire record, the intervenors argued that a school could easily be placed in numerous other zones in Clifton, and, thus, there is no need to put one in an M-2 Industrial Zone. However, this argument is illusory because, under the Clifton Zoning Ordinance, schools are not allowed as of right in any zone, but rather are conditional uses in most zones. The restrictions imposed for a school as a conditional use include:
(1) Minimum lot size: one acre.
(2) Minimum lot width: 150 feet.
(3) Minimum lot depth: 150 feet.
(4) Maximum lot coverage: 20%.
(5) Maximum height: two stories; 30 feet.
This is in addition to the bulk and off-street parking requirements a school would be subject to. These restrictions severely limit the possible sites available for a high school annex. To comply with these restrictions, an eight-acre site would be necessary to accommodate a school of similar size to the proposed annex.

III.
Also at issue in this case is whether the Clifton School Board was statutorily required *342 to make a formal submission to the Local Planning Board. Authority to approve capital projects of school districts is vested in the State Board of Education and delegated to the Bureau of Facility Planning Services within the Department of Education. N.J.A.C. 6:22-1.11(f)(2). Before the Department of Education will consider a proposed land acquisition by a board of education, it requires a submission of plans to the municipal planning board. N.J.S.A. 40:55D-31 reads in pertinent part:
a. Whenever the planning board shall have adopted any portion of the master plan, the governing body or other public agency having jurisdiction over the subject matter, before taking action necessitating the expenditure of any public funds, incidental to the location, character or extent of such project, shall refer the action involving such specific project to the planning board for review and recommendation in conjunction with such master plan and shall not act thereon, without such recommendation or until k§ days have elapsed after such reference without receiving such recommendation. This requirement shall apply to action by a housing, parking, highway, special district, or other authority, redevelopment agency, school board or other similar public agency, State, county or municipal. In addition, this requirement shall apply to any public entity taking any action to permit the location, erection, use or maintenance of an outdoor advertising sign required to be permitted pursuant to P.L.1991, c. 413 (C. 27:5-5 et seq.)(emphasis added).
b. The planning board shall review and issue findings concerning any long-range facilities plan submitted to the board pursuant to the "Educational Facilities Construction and Financing Act," P.L.2000, c. 72 (C. 18A:7G-1 et al.), for the purpose of review of the extent to which the long-range facilities plan is informed by, and consistent with, at least the land use plan element and the housing element contained within the municipal master plan adopted pursuant to section 19 of P.L.1975, c. 291 (C.40:55D-28) and such other elements of the municipal master plan as the planning board deems necessary to determine whether the prospective sites for school facilities contained in the long-range facilities plan promote more effective and efficient coordination of school construction with the development efforts of the municipality. The planning board shall devote at least one full meeting of the board to presentation and review of the long-range facilities plan prior to adoption of a resolution setting forth the board's findings.
Furthermore, to obtain approval for "educational adequacy" pursuant to N.J.A.C. 6A:26-5.3, a district must submit "a copy of the transmittal letter indicating the date of plan submission to the local planning board." Also, N.J.A.C. 6A:26-3.2(c) states that "[a] district shall provide to the Division proof of the date that it submits each school facilities project application to the local planning board." In addition, whenever site work is required on the property, the district must submit a completed plot plan which indicates the location of the school and a layout of all other structures, including easements. N.J.A.C. 6A:26-5.3 (a)(5).
In addition, subsection (4)(a) of the application for land acquisition, a required document under N.J.A.C. 6A:26-7.1, states that if "recommendations of the local planning board" are not submitted to the Department of Education, the application is "NOT APPROVED." Thus, a local school board must make a formal application to a local planning board before making an application *343 for land acquisition approval to the State Department of Education.
However, the School Board argues that based solely on the Appellate Division decision in Murnick, the School Board did not have to seek site plan approval from the Clifton Planning Board. However, the Court in Murnick stated:
when the local school board determines to undertake the construction or addition of a school, it must refer the proposed capital project for review and recommendation to the local planning board whenever the planning board has adopted any portion of a master plan. The local school board may not act upon such proposal without first reviewing the planning board's recommendations, or until forty-five days have elapsed without receipt of recommendation.
[Murnick, supra, 235 N.J.Super. at 229, 561 A.2d 1193 (emphasis added)].
Despite the School Board's argument, the Murnick decision more correctly stands for the proposition that the planning board's recommendations to the Department of Education are not binding. Thus, Murnick indicates that "public schools are not subject to ... "(bulk and other zoning requirements). Ibid. As further noted in Murnick, the role of the local planning board is merely advisory. Id. at 227, 561 A.2d 1193. The purpose of this framework is to provide a municipal body, with local knowledge of the specific location, an opportunity to express its concerns about the site.
In this case, throughout the hearings, there was dispute over which submissions were made to the Clifton Planning Board and the Department of Education. Therefore, this Court must determine whether a formal submission, as required by N.J.S.A. 40:55D-31, was made to the local planning board.
On September 22, 2004, Sin-U Nam, an architect for the School Board, sent a letter to the City Planner of Clifton. It stated, "As part of the submission package to the State Department of Education for land/building acquisition approval, we need a letter from the local planning board that your [sic] have reviewed the schematic site plan. If you have comments on the schematic site plan, please send them to us ASAP. We will make a formal application to you when the bond referendum passes in December 2004 and the project becomes a reality." Enclosed with this letter was the original schematic plan dated September 22, 2004, which did not include the easement.
In a letter dated October 1, 2004, Dennis Kirwan, the City Planner of Clifton, responded to the School Board's request. Mr. Kirwan wrote in pertinent part:
Upon review of your schematic, I have several questions. Please address the following:
1. What are they [sic] existing conditions there now.
2. How many parking spaces exist on site.
3. How will the 38 spaces be utilized with 500 students attending.
4. This application may have to go before the Zoning Board of Adjustment because of a change in use.
5. There will be several variances that your application will need because of the change in use.
6. Need full Bulk Schedule for existing use and proposed use.
7. How many staff members will be in attendance.
8. By rough calculations parking requirements exceed 60 spaces.
9. Recreation and/or eating areas outside the facility.
10. Fencing needs.

*344 These are just a few of the more obvious items for our office to consider.
Then, on November 3, 2004, the Department of Education made its first approval of the Annex project through a letter from Bernard E. Piaia, Jr., Director of the Office of Facilities, to Dr. Michael Rice, Superintendent of Clifton School District. The letter quoted the Clifton School District's application in which the School District checked a box labeled "YES" to indicate that it had obtained "[r]ecommendations of the local planning board of the municipality in which the land is situated and which had an approved master plan or evidence that 45 or 55 days have passed." The School District's affirmative response to this statement indicates that the School Board considered Mr. Kirwan's letter to be a formal recommendation.
On May 4, 2005, the Clifton School Board entered into an easement agreement with Mayer.
On August 29, 2005, Mr. Kirwan wrote to Mr. Piaia, referencing the above quoted application made to the Department of Education stating, "an application was never made to the Planning Board as per MLUL 40:55D-31(a) to review and offer comments on the site plan and planning aspects of this project," and, accordingly, "this acquisition project should not have been approved."
On September 27, 2005, in response to Mr. Kirwan's letter, Mr. Piaia wrote that the Department of Education regarded the City Planner's concerns voiced in the October 1, 2004 letter as "evidence that the district had complied with the planning board submission requirements of Section 31(a), and the Department considered the concerns voiced in [the] letter."
Subsequently, the Clifton School Board submitted a revised Site Plan to the Zoning Board, but not the Planning Board, dated September 2, 2005, which included the easement. On, December 8, 2005, at the request of the Zoning Board, the Department of Education wrote a letter stating that the original plan, dated September 22, 2004, did not show the easement. However, the revised plan included the sliding gate, and pursuant to this revised plan, the Department of Education issued its revised approval of the site.
The School Board contends that Mr. Piaia felt that the Clifton School Board complied with N.J.S.A. 40:55D-31 by way of the letter from Mr. Kirwan, which referenced the original plan. However, this Court finds that this letter alone fails to fulfill the School Board's obligations under N.J.S.A. 40:55D-31.
The School Board failed to make a formal application to the local planning board. First, the simple correspondence between the Board's architect and the City Planner prior to the passing of the referendum was not sufficient under the statute. Mr. Kirwan's letter simply sought more information from the School Board, and Mr. Kirwan did not intend for his letter to constitute final recommendations to the School Board pursuant to N.J.S.A. 40:55D-31. The fact that Mr. Kirwan did not intend for his letter to serve as a final recommendation is evidenced by the fact that the School Board's architect had previously informed Mr. Kirwan that a formal application was forthcoming. Therefore, the Department of Education approved the Annex project when the requirements of N.J.S.A. 40:55D-31 had not been fulfilled. The Department should have denied the application pursuant to N.J.A.C. 6A:26-7.1.
Second, even if the correspondence from the City Planner was meant to be a final review, it would still be insufficient. N.J.S.A. 40:55D-31(a) requires submission of the project plans "to the *345 planning board for review and recommendation." A city planner is not a member of the planning board. N.J.S.A. 40:55D-23.[6] Nowhere in the MLUL is a city planner given the power to approve site plans without examination from the planning board.
Third, and most importantly, the plans submitted to the Planning Board on September 22, 2004 and the final plans approved by the Department on December 8, 2005 differ in ways that impact safety issues relating to children attending the Annex. More specifically, the plan submitted to the Planning Board on September 22, 2004 did not indicate the presence of the easement and several alterations that were made to the parking, ingress, and egress of the site. The Department's letter, dated December 8, 2005, acknowledged these discrepancies between the two plans. The School Board provided revised site plans to the Department, but no such submissions were made to the Planning Board.
The failure to submit plans with these alterations, which were factors in the Zoning Board's denial of the application, defeats the purpose of N.J.S.A. 40:55D-31. The Planning Board's examination of the site plan is not binding on the Department of Education. However, the provision was implemented to provide local entities, with knowledge of sites, an opportunity to inform the Department of specific site plan concerns. Therefore, since the School Board failed to make a formal submission to the Clifton Planning Board, this Court is satisfied that the School Board did not comply with their statutory obligation under N.J.S.A. 40:55D-31.

IV.
For the foregoing reasons, the Zoning Board's denial of the School Board's application is reversed and remanded as follows. This Court orders the Clifton School Board to make a formal application, pursuant to N.J.S.A. 40:55D-31, to the Clifton Planning Board within 10 days of this decision. The Planning Board's review of the proposed plans will be consistent with the limitations imposed by N.J.S.A. 40:55D-31, this opinion, and the Murnick decision. 235 N.J.Super. 225, 561 A.2d 1193. The formal application shall include completed plans of the proposed Annex, transcripts from the Board of Adjustment hearings, all exhibits, the Zoning Board's Resolution, and this opinion. The Planning Board shall not be required to have a testimonial hearing.
After submission to the Planning Board, the Clifton School Board shall make a renewed application to the Department of Education for approval of the proposed site pursuant to the time frame set forth in N.J.S.A. 40:55D-31. Such application will include the Planning Board's recommendations, if it elects to make any within the time frame set forth in N.J.S.A. *346 40:55D-31. If the Department of Education approves the proposed Annex, the use variance application shall proceed to the Clifton Zoning Board of Adjustment for approval.[7]
Upon the submission of the Department's approval, the Zoning Board shall have 45 days to adopt a new decision and Resolution. No new fact-finding hearings shall be held. The decision of the Zoning Board shall be limited to the detrimental effects of the proposed use on the zoning ordinance and the neighborhood based on the record before it. In addition, this Court is satisfied that no conflict exists between the Master Plan and the proposed use. This Court retains jurisdiction over this matter.
NOTES
[1] Public hearings took place on the following dates: August 17, September 21 and 28, October 5, 19, and 25, November 5 and 19, and December 13, 14, and 17, 2005; and January 5 and 19, February 2 and 16, and March 2 and 16, 2006.
[2] City of Clifton Master Plan, Section 1.4.
[3] City of Clifton Master Plan, Section 2.0.
[4] The Public School Education Act of 1975, N.J.S.A. 18A:7A-1 to-52.
[5] In Robinson v. Cahill, the Supreme Court held that "the obligation being the State's to maintain and support a thorough and efficient system of free public schools, the State must meet that obligation itself or if it chooses to enlist local government, it must do so in terms which will fulfill that obligation." 62 N.J. 473, 509, 303 A.2d 273 (1973).
[6] "Class Ithe mayor or the mayor's designee in the absence of the mayor ... Class II one of the officials of the municipality other than a member of the governing body, to be appointed by the mayor; provided that if there be an environmental commission, the member of the environmental commission who is also a member of the planning board as required by section 1 of P.L.1968, c. 245 (C.40:56A-1), shall be deemed to be the Class II planning board member for purposes of this act in the event that there be among the Class IV or alternate members of the planning board both a member of the zoning board of adjustment and a member of the board of education ... Class IIIa member of the governing body to be appointed by it ... Class IVother citizens of the municipality, to be appointed by the mayor. A letter and preliminary plans submitted to a City Planner, who is not a member of the Planning Board, is not sufficient to fulfill the requirements of N.J.S.A. 40:55D-31."
[7] The School Board contends that it would be futile to remand the issue to the Zoning Board. Plaintiff cites to bias on the part of the Zoning Board and an exhaustive record. They argue that the Zoning Board "obviously believed that the School Board should not have purchased 290 Brighton Road before obtaining a use variance. There can be no doubt that [sic] record before the Zoning Board was fully developed. No additional facts could or need to be adduced on remand." However, as stated previously, if the use variance application comes before the Zoning Board, after approval from the Department of Education, the Zoning Board will be limited by this opinion and the record before it, with no further fact-finding hearings.